[Civ. No. 4434.  Third Appellate District.—December 15, 1932.]

CORA E. FALES, Respondent, v. NEW YORK LIFE INSURANCE COMPANY (a Corporation), Appellant.

McCutchen, Olney, Mannon & Greene and Mannon & Brazier for Appellant.

Robert E. Hatch and A. L. Wessels for Respondent.

PULLEN, P. J.—Defendant appeals from a judgment of $3,000 on a life insurance contract payable to respondent herein as beneficiary. The defendant claims that Byron E. Fales, the insured, had made false representations in his application for the policy. The application wherein the alleged false representation was contained was dated March 14, 1929, and the policy issued March 21, 1929. The insured died January 19, 1930, the cause of death being pulmonary tuberculosis. In the application for the policy and upon which the policy was issued appeared a question:

"7.E. Have you ever raised or spat blood?" To which the applicant answered "No."

Appellant contends the finding of the trial court "that said Byron E. Fales before the said date of March 14, 1929, had never raised and/or spat blood . . ." was not supported by the evidence and on that issue relies for reversal. Most of the testimony at the trial centered upon the condition of health of the insured within the year preceding March 14, 1929, the date of the application and the ten months intervening between that date and his death. At the time of the application for the policy Byron Fales was about twenty-four years of age and from the medical examiner's report attached to the application, which was

received in evidence, the pulse rate was found to be 74, height 5 feet 10 inches, exact weight 150 pounds, girth of chest at fourth rib 36 inches, and in response to the question "Is applicant's general appearance healthy?" the answer by the medical examiner was "Yes." He was unmarried and lived on his parents' ranch near the town of Dos Rios in Mendocino County practically all of the time up to his death except for intervals of a few weeks from time to time when he was away on short trips.

There is a decided conflict in the testimony of the witnesses for the insured on the one hand and for the company on the other, and it becomes the duty of this court to say where the truth lies between the two.

The defendant called four witnesses who testified directly and positively as to the spitting of blood.

Mrs. Clara Vinton, a witness called by the defendant, testified she was well. acquainted with the insured and his family for many years. During the Christmas season of 1928 he visited the Vintons, remaining about five days. The witness testified that during that time he, together with three other young men, Brian and John Vinton, her sons, and a young man named Reel, slept in a cabin near the family home. Upon the occasion of that visit Mrs. Vinton testified that the deceased was sick all of the first day he was there, December 26, 1928; she told how he sat around the fire, and starting to cough, went out of the kitchen and to the back of the house and there sat upon a box and coughed blood and pus from his lungs. She helped him back into the house and to the fire, where he had a chill and was very sick. She testified also that on the day following he was very sick and was brought from the cabin up to the house by the boys, where he had another spell of coughing, but not quite so bad and that she again observed him spitting blood. She described his cough as a "hacking cough". The witness stated that at that time she observed that he had tuberculosis, although that was three months before he was passed on his medical examination by Dr. Hogshead, the examining physician for appellant, and approximately six months before he was examined by Dr. Bennett, who in his examination used a stethoscope and took his temperature and sounded his chest and

Dr. Bennett stated he thought he was only then beginning tuberculosis.

Brian Vinton, a son of Mrs. Vinton, testified that at the time of Byron Fales' visit to their place during Christmas, 1928, he had a bad cough "sounded like away down in his lungs, coughed hard and his voice seemed to change, he had a coarser voice". He also testified that during the visit in December, 1928, he and Byron slept in the same bed. He did not notice that deceased had any trouble holding food in his stomach although his mother testified that he "had a good appetite . . . but couldn't keep it on his stomach; when he ate in a few minutes it would come up; I don't think he retained anything more than a half hour while at my place".

Luke Vinton, another son of Mr. and Mrs. Vinton, testified that he had spent a portion of the time at the home of his parents during the Christmas holidays of 1928 and had observed the physical condition of Byron Fales, although he was not asked about any spitting of blood. He testified the health of Byron was very bad, that "he saw him coughing like he always did and he was taking some kind of medicine", and also: "Q. Now, did he have spasms of coughing this Christmas? A. Yes. Q. What were those like? A. They were so hard—we had an old wagon in the yard and he would rest himself on this wagon and cough. Q. Did you see that? A. I did. Q. Would he throw up anything? A. He would spit. Q. What would he bring up? A. I never did investigate that."

John Vinton and a young man named Reel who also occupied the cabin with Byron Fales during Christmas, 1928, were not called as witnesses.

John M. Vinton, the husband of Mrs. Clara Vinton, testified he was home during the Christmas season of 1928 while deceased was visiting them. He did not testify that he saw deceased vomit his food or have any hemorrhages, although he said his wife told him she had disposed of evidence of a hemorrhage. Neither did he testify that deceased went to bed during the day on account of his illness. He testified that "Byron and my boys slept in the other house and the family in another house; so they spent most of the time in the other house," and further: "Did you notice any spells of coughing that he had at Christ-

mas time? A. I don't know I noticed any more than he was coughing and seemed to have some disease. Q. You didn't see the hemorrhages at Christmas time, did you? A. No, I never did."

L. C. Barnes was one of the witnesses called by defendant, who testified that he had seen Byron Fales spit blood.

It appeared from the record that a hog had strayed or been stolen and the witness, together with Martin Hanke, Eugene Provost and the deceased, had been delegated to search for the missing animal throughout the surrounding country. Mr. Barnes was riding a horse; Provost, Hanke and deceased were walking. As they were climbing up an incline out of a creek-bed the witness testified that deceased became weak and had to stop upon two occasions on account of his coughing. When asked to describe the cough the witness answered: "Well, at that time his cough was in the nature of a hemorrhage . . . lasted say half a minute." He observed the witness at that time raised "a kind of bluish substance and I noticed a slight trace of blood in it". This instance occurred between January 27 and February 4, 1929.

On cross-examination it appeared that the witness Barnes was a defendant in an action by William Fales, the husband of respondent herein, to evict him as a squatter from certain farm lands claimed by Fales, which action was still pending at the time of the trial of this action. It also appeared that Barnes had written the insurance company after the death of Byron Fales, but the contents of the letter were not disclosed. During the cross-examination he was asked if he had not told certain persons that he was going to throw a monkey-wrench into the machinery that would prevent a recovery from the insurance company, to which Barnes made the rather unconvincing answer "I do not think so." It also appeared that several witnesses called by the insurance company in this case who testified against the respondent herein were witnesses for Barnes in the case of *Fales* v. *Barnes,* above referred to. These witnesses were John Vinton, Luke Vinton, Eugene Provost, Mrs. Vinton, L. C. Barnes and Mrs. L. C. Barnes. As to Mrs. Vinton, respondent points out that she testified to a conversation had between decedent and his mother, respondent herein, in her presence some time during the latter

part of June, 1929, wherein she testified that decedent said he had just returned from a visit to Dr. Bennett, who told him "he was rotten with consumption". When Dr. Bennett was called he denied he told Byron Fales that he had tuberculosis.

Eugene Provost, who was one of the members of the expedition above mentioned, testified that Byron Fales had to stop on account of a coughing spell and observed that he raised sort of a yellowish mucus, but he did not testify as to the spitting or raising of any blood.

Martin Hanke was also on this trip and he testified that deceased was compelled to stop while climbing up the hills on account of shortness of breath and that he observed two coughing spells but did not see what was spit up.

Renne Provost testified that he knew Byron Fales and during 1928 and 1929 saw him on an average of twice a week and testified that in the fall and winter of 1928 "that he had a sort of cough and that sometimes it was a dry cough and at other times he spit up blood and phlegm".

Another witness called by the applicant was Gwendolyn Edwards, who testified that they were friends and occasionally were together attending social affairs. That some time prior to April, 1928, she noticed that he coughed a great deal and on one occasion saw him spit blood. When asked what it looked like she said "some mucus and a little blood. I did not pay much attention to it—he called my attention to it is what made me notice it. Q. What did he say? A. He said that it was from his lungs."

The foregoing constitutes all of the direct testimony in regard to the spitting of blood by the deceased.

The respondent called thirteen witnesses who testified as to the physical condition of the deceased during the time under observation.

The respondent herein, the mother of deceased, testified that the premiums were paid by her and testified that she never saw him, prior to the time of taking out the insurance, cough or spitting up blood.

Mr. William Fales, the father of deceased, testified that prior to the taking out of the policy of insurance he never saw any indication of weakness on the part of the son nor did he ever see him have any coughing spells.

Vernon Fales, a brother, testified that he never saw deceased, prior to March 21, 1929, ever spit blood or ever have any coughing spasms and that in the spring of 1929, prior ·to taking out the policy of insurance, deceased had worked with the witness on the ranch cutting wood, plowing and carrying on general ranch work, during which time he also, together with two other men, engaged in the loading of at least two cars of wood a month and that during that time he and the deceased engaged in wrestling and boxing with the young men of the community.

Mr. E. M. Calmer testified for the plaintiff that he was the athletic director of the Olympic Club in San Francisco and knew and worked with the deceased in about September and October, 1928. He testified that Byron Fales was in excellent condition at that time and a very fine type of athlete and that during a part of that time the witness was engaged in unloading grain cars in the town of Dos Rios. He also saw him loading wood into the cars and they were together often in going over their trap lines during the winter months 1928–1929 and that during all of the time that he knew deceased he never saw him spit up any blood or have any violent coughing spells or show any physical weakness.

Dr. E. C. Bennett, a physician and surgeon of Ukiah, was called and denied that he had ever told Byron Fales that he was "rotten with tuberculosis" as was testified to by Mrs. Vinton. He did say that he examined him in June, 1929, at which time he took his temperature and examined his chest and lungs and concluded he probably had incipient tuberculosis.

Carl Johnson testified that he knew Byron Fales and that he had seen him on frequent occasions in the fall of 1928. That he and the deceased were both members of the athletic club of Dos Rios and that he had boxed with him and indulged in other athletic exercises and had not noticed any particular shortness of breath or any violent coughing spell.

Tony Bernott was a farmer living near Dos Rios and saw him in 1928 and 1929. He also had observed the deceased about the athletic club and had there seen him boxing; when asked about his physical condition in the spring of 1929 he said "the boys in the bunch couldn't beat him out;

sometimes it was an even match of boxing—some of the boys were larger than he—I never saw any sign of weakness on his part—nor shortness of breath—nor saw him vomit or cough violently.'' That he had employed him to load a car of wood and that he was physically able to do the work.

Harvey Goddard testified that he knew the deceased and had seen him in and about the athletic club of which he was the president. He testified that the deceased was the athletic director of the club and that he had seen him box and had boxed with him and he had never seen him have any coughing spells and never saw him spit blood or saw any other signs of weakness or shortness of breath. Also that they had been on fishing and hunting trips together. The period of time covered by the witness was January, February and March, 1929.

Fred Crabtree testified that he saw Byron Fales in the spring of 1929 and that he spent about a week at his place in the early part of April, 1929. They were hunting wildcats together about every day, going over rough country on foot following the dogs and that during that time he never saw him spit up any blood or have any coughing spells.

Oroville Johnson was a member of the athletic club and boxed with the deceased on various occasions and testified that he never saw him spit up any blood or evidence any sign of weakness.

Lloyd Fish was the agent who wrote the policy of insurance in question. He testified that he was not personally acquainted with Byron Fales and that when he first saw him he called upon him at his home at which time he was engaged in digging a ditch with a hoe and that he talked with him perhaps one hour and a half before he obtained his signature to the application, and that from his appearance he considered him in good health and that he looked physically in good condition.

George Fales, a brother of deceased, testified as to a trip that the two boys took in Oregon in April of 1928, and that at that time they weighed in San Francisco and the deceased weighed 145 pounds and that they were together continuously in Oregon until about the twenty-second day of September, 1928, when the deceased returned to Cali-

fornia. Just prior to his leaving he was again weighed at the mill store and he weighed 140 pounds. They were doing heavy work, eight or nine hours a day every day of the week, including Sundays. At that time he never saw him spit up any blood and did not see or hear him cough.

Henry Courtney knew the deceased before his trip to Oregon and at that time he described his physical condition as being very good and upon his return from Oregon noticed but little if any difference in his condition. He testified he saw him cough a little but never saw him spit blood at any time. He also saw him cutting and hauling wood on the ranch and in the latter part of 1929 saw him taking part in the unloading of a car of grain.

The foregoing constitutes a summary of the testimony of the witnesses called by the plaintiff with direct reference to the physical condition of the deceased and particularly as to the spitting of blood.

■ It is an elementary principle of law that a false representation or concealment of a material fact may, in connection with the issuance of a policy of insurance, entitle the party relying thereon to rescind on ascertaining the truth. (*Boyer* v. *United States Fidelity & Guaranty Co.*, 206 Cal. 273 [274 Pac. 57]; *Whitney* v. *West Coast Life Ins. Co.*, 177 Cal. 74 [169 Pac. 997]; *Iverson* v. *Metropolitan Life Ins. Co.*, 151 Cal. 746 [91 Pac. 609, 13 L. R. A. (N. S.) 866]; *Layton* v. *New York Life Ins. Co.*, 55 Cal. App. 202 [202 Pac. 958].)

It is also evident that if the deceased had raised or spat blood as related by the witnesses, he must have been aware of that fact and there can be no doubt that the spitting or raising of blood is regarded by medical men as a serious symptom of internal disorder and that the insurance company was entitled to a full and truthful answer by the applicant.

We have set forth the testimony of appellant somewhat fully because it stresses the fact that the spitting of blood was adduced by them by eye-witnesses, whereas the testimony of respondent was negative as to the actual spitting of blood.

Respondent, however, emphasizes the fact that the testimony she introduced shows that during the time in question the deceased was engaged in trapping in the mountains

during the dead of winter, walking and climbing over the mountains in the vicinity of Dos Rios, loading of cars of grain and wood, acting as boxing instructor in the local athletic club and boxing and wrestling with the members thereof, hunting and fishing, engaged in general farm work and working in the lumber-mills in Oregon, and that therefore it negatived and was wholly irreconcilable with the testimony of the defendant.

The trial court was presided over by a capable and impartial jurist who, after listening to all of the testimony adduced and after observing the manner of the witnesses on the stand, analyzing their motives and considering the conflicting and contradictory evidence, found that the deceased had not raised or spat blood.

Although a witness is presumed to speak the truth, and it is the general rule that the uncontradicted testimony of a witness to a particular fact may not be disregarded, nevertheless a trial court is not bound to decide in conformity with the declaration of any number of witnesses who do not produce conviction in its mind against a presumption or other evidence satisfying its mind. (*Morris* v. *Morris,* 84 Cal. App. 599 [258 Pac. 616].)

"Neither court nor jury is bound by the mere declaration of a witness . . . no matter how improbable, incredible or impossible, that declaration may be. It is a principle recognized in all cases . . . 'It is a wild conceit that any court of justice is bound by the mere swearing; it is swearing credibly that is to conclude its judgment.' " (*Zibbell* v. *Southern Pac. Co.,* 160 Cal. 237 [116 Pac. 513, 515].)

Mr. Justice Sloss, in the case of *Bancroft-Whitney Co.* v. *McHugh,* 166 Cal. 140 [134 Pac. 1157, 1158], says, in regard to the sufficiency of evidence to support findings: " . . . it must be borne in mind that, in examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding. In our further statement of facts, we shall not, therefore, undertake to recite the testimony, abun-

dant as it may be, which would have supported a finding in favor of appellant's allegation of a conversion. All that is required is to point out testimony which, if given credence by the trial court, would logically lead to the conclusion that there had been no conversion by the defendant. That much of this testimony was contradicted is, in this inquiry, an entirely unimportant consideration.''

''The decision of the trial court, upon questions of fact, is conclusive upon the appellate court, in so far as there is any substantial evidence tending fairly, with such inferences as may reasonably be drawn therefrom, to support such decision.'' (*Clopton* v. *Clopton,* 162 Cal. 27 [121 Pac. 720, 721].)

''The determination reached by the trial court upon all matters of fact is binding upon an appellate court, except only in the single instance where there is no substantial evidence to support the findings of the trial court, and if such instance is found in the records, then the findings must stand, notwithstanding the satisfactory character of appellant's evidence.'' (*King* v. *California Bank,* 73 Cal. App. 136 [238 Pac. 108, 109].)

After carefully reading and analyzing the entire record we cannot say that there is not evidence which, if given credence by the trial court, would not logically lead to the conclusion found and for that reason the judgment should be affirmed, and it is so ordered.

Plummer, J., and Thompson (R. L.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 14, 1933, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 9, 1933.