[Civ. No. 5454.   Third Appellate District.—March 24, 1936.]

ALBERTA L. WILLS, Appellant, v. THE POLICY HOLD-
ERS LIFE INSURANCE ASSOCIATION (a Corpora-
tion), Respondent.

Sefman & Bernard and Ernest M. Torchia for Appellant.

Charles D. Warner and Thomas W. Hughes for Respondent.

THOMPSON, J.—The plaintiff, who is named as beneficiary in a life insurance policy, has appealed from a judgment which was rendered against her on the ground that the contract was void because of false statements made by the insured in her application therefor.

July 16, 1931, Ruby Broadwater, a widow 48 years of age, signed a written application for membership in The Policy Holders Life Insurance Association, a mutual benefit association of California, organized under the provisions of division 1, part 4, title 2, chapter 4 of the Civil Code. That application contains the following affirmative statements:

"(Q) Are you now in good health? (A) Yes. . . . (Q) Have you knowledge that any physical or mental disease exists in your system? (A) No. . . . I am in good health and *so far as I know* have no disease or other conditions which would prevent me from obtaining life insurance. I agree to the terms, conditions and provisions of the certificate of membership that this application become a part of such certificate and that any false statement, misrepresentation or concealment of any material fact on my part shall make void my membership."

In consideration of the payment of $5 per annum this application was accepted, and a policy of $1,500 was issued by the company July 16, 1931, on her life. Alberta L. Wills was named as beneficiary in the policy. It provided that, "A false statement, misrepresentation or concealment of any material fact in the Application for Membership shall make void this Certificate and shall bar the right of any beneficiary to collect any sum hereunder". November 2, 1931, the insured died as a result of sclerosis with occlusion of the left coronary artery of the heart. The company refused to pay the insurance. This suit on the policy was then commenced.

The cause was tried by the court sitting without a jury. The court adopted findings to the effect that it was not true that the insured was "now in good health" when her application for insurance was made and upon the contrary determined that she "had then existing in her system and was at that time afflicted with chronic interstitial nephritis, hypertension and myocarditis". But the court failed to find either that the insured knew that she was then afflicted with heart disease or any other ailment, or that the policy was procured by fraud. Upon the findings adopted the court rendered judgment against the plaintiff. From that judgment she has appealed.

■    There is no substantial evidence to support the judgment which was rendered against the plaintiff in the present case. The burden was on the defendant to prove as a matter of defense that the statements of the insured which are contained in her application were not only untrue but that she knew they were false or at least that she had reasonable cause to believe they were false.    ■    The written application for insurance is specifically made a part of the policy. It does not constitute a warranty that the applicant was in "good health". The language of that application refutes the assumption that she was guaranteeing that her health was good. After asking her if she was in good health, the very next question was, "*Have you knowledge* that any physical . . . disease exists in your system?" The following statement is "so far as I know have no disease".    ■    Moreover, the court carefully refrained from finding that she then knew of the heart disease of which she subsequently died. Since the court merely found that it was not true that she was in "good health" at the time of her application, but upon the contrary that she was then afflicted with heart trouble, and failed to also find that she knew of that chronic ailment, we must assume the court misapprehended the law and concluded that the defendant was entitled to a judgment in its favor merely because the statement that the applicant was then in good health was not true. There is no evidence in the record to the effect that the insured did then know she was afflicted with heart disease or that she had symptoms which should have warned her of that fact. The evidence is just the contrary.

The plaintiff testified:

"I last saw the deceased alive a few days prior to her death. . . . Between the years 1928 and November 2, 1931, the date of the death of said Ruby Broadwater, I lived, off and on, with the deceased, and during that period of time, the deceased did not complain of any illness or sickness, nor, during said period of time, was she confined to her bed on account of illness or sickness, and that during said period of time deceased was constantly able to work, and appeared to be in good health."

It also appears from her application that she had not consulted a physician for any illness or ailment for more than three years prior thereto. It does appear she was confined in a hospital for a few days in 1924, seven years before this policy was issued. It does not appear what ailment then required her to go to a hospital. It also appears she had no family physician. And it is true that she carried other insurance when this policy was issued and that she had never been rejected in any previous application for insurance. These facts are not controverted.

After the death of Ruby Broadwater, Dr. Wagner performed an autopsy on her body and discovered that she died from "sclerosis with occlusion of the left coronary artery of the heart". He said that the heart was enlarged; the arteries of the kidneys were somewhat hardened, but that no other organic disease appeared. He testified that this heart disease had probably been progressing for two, three or four years. He said that it was his opinion she was not in good health in July, 1931, when the application for insurance was made. The doctor makes it clear that the deceased may not have had symptoms which would warn her of the ailment. He testified that this heart disease was not necessarily accompanied by acute pains or repeated attacks; that the fatal shock may have been the first attack. But he did say the disease would "probably give certain ill-defined symptoms of just not being very strong or not very good health". Dr. Pollia testified to substantially the same symptoms and results of heart disease. He also said that the patient might not suffer from previous sharp pains in the heart or chest, but he did add that the condition described by Dr. Wagner was very likely chronic and of long duration. He described the symptoms of the disease as follows:

"In the beginning the patient might notice frequency of urination at night, a shortness of breath, easily fatigued, increase of blood pressure; and then as the ·condition became more advanced, these symptoms would increase, and there would be enlargement of the heart, swelling of the body and extremities; perhaps pain in the region of the heart itself; certain chemical findings in the urine. . . . Some of those symptoms are always present; perhaps not all of them in every case."

Dr. Blank, who for nine years had charge of a Los Angeles hospital and was a physician of wide experience, testified that if the deceased had suffered a mere partial obliteration of the coronary vessel she "might get along all right and carry on the different ordinary requirements of life, and not complain of any symptoms at all. In that condition a patient very often might go on although they will feel a little tired, but never complain of anything like pain, and all of a sudden they will die." In other words, the doctor testified that the condition of the heart of the deceased as disclosed by the autopsy might not be preceded by sharp pains in the region of the heart, nor by any other symptoms which a nonexpert would recognize as a heart affliction or other serious ailment, and that when a total obliteration of the coronary vessel suddenly occurred, the patient would die instantly without previous warning. There is no evidence in this record to the contrary.

In spite of the fact that the autopsy disclosed a chronic heart disease which must have been developing for some time, there is not a syllable of evidence to indicate that the insured possessed knowledge of that fact. Nor is there any evidence that symptoms of the disease existed which should have warned a reasonable person of its presence. Nor are there any facts from which we may presume that the deceased knew of the existence of that disease. In truth, the affirmative evidence is just the contrary. She carried other insurance. She consulted no physician. She had worked constantly for several years past. She appeared well, and she never complained of illness or ailment, even to her friend and the beneficiary named by her in the policy. We are persuaded the insured did not know of the existence of any serious physical ailment when she applied for the policy. Certainly the defendant failed to prove that she had any such

knowledge. The judgment is therefore not supported by the evidence.

The mere fact that the insured first said that she was "in good health", in the absence of evidence that she knew or believed that she was not in good health, is not such misstatement of fact or fraud as will render an insurance policy void. (*Burr* v. *Policy Holders Life Ins. Assn.*, 128 Cal. App. 563 [17 Pac. (2d) 1014, 1015] ; 4 Cooley's Briefs on Insurance, 2d ed., p. 3296, sec. 17, subd. [i].) In the Burr case above cited it is said in that regard:

"The term 'good health' in the life insurance policy or application is comparative, and an assured is in good health unless affected with a substantial attack of illness threatening his life or with a malady which has some bearing on the general health. It does not mean perfect health; nor would it depend upon ailments slight and not serious in their natural consequences."

And in 2 Cooley's Briefs on Insurance, at page 3296, it is said with respect to the use of the term "good health":

"If the applicant is free from apparent sensible disease, and unconscious of any derangement of important organic functions, he may truthfully say that he is in good health, although he may have some slight or temporary indisposition."

The preceding definitions of the term "good health" are peculiarly applicable to the facts of this case, for the very next statement of the applicant is that "so far as I know have no disease". That statement regarding the general state of the applicant's health upon which the respondent relies does not constitute fraud nor furnish grounds upon which the obligation of the insurance company may be repudiated. In the absence of evidence to the contrary, we must assume the insured believed she was in good health at the time she signed her application for a policy.

In the case of *Chase* v. *Sunset Mutual Life Assn.*, 101 Cal. App. 625 [281 Pac. 1054], the syllabus correctly states the principle of law therein determined with respect to the effect upon a life insurance policy of erroneous statements innocently made by an assured in his application for a policy with respect to his condition of health. It is there said:

"Where the insured's representations regarding his health in an application for life insurance were honestly made, and

were justified by his then knowledge of his physical condition, the mere fact that the representations of the insured were proved to be unfounded by subsequent events, in the absence of fraud or deceit, would not avoid the policy.''

In the present action the burden was on the defendant to prove not only that the insured was afflicted with serious heart disease at the time she signed her application for membership, but also that she then knew she had that ailment. (*Weiss* v. *Policy Holders Life Ins. Assn.*, 132 Cal. App. 532, 536 [23 Pac. (2d) 38]; *Chase* v. *Sunset Mutual Life Assn.*, *supra.*) The defendant failed to sustain this burden. The judgment is not supported by the evidence.

The judgment is reversed, and the court is directed to render judgment for the plaintiff as prayed for in her complaint.

Pullen, P. J., and Tuttle, J., *pro tem.*, concurred.