[Civ. No. 16750.   First Dist., Div. Two.   Aug. 27, 1956.]

SAN FRANCISCO LATHING COMPANY, INC. (a Corporation), Appellant, v. THE PENN MUTUAL LIFE INSURANCE COMPANY, Respondent.

Leonard A. Worthington, Alfred Taddeucci and Ralph Bancroft for Appellant.

Henry C. Clausen, Henry C. Clausen, Jr., Walker Lowry and McCutcheon, Thomas, Matthew, Griffiths & Greene for Respondent.

DOOLING, J.—Plaintiff, San Francisco Lathing Company, Inc., sued as beneficiary to recover on a $50,000 policy of insurance issued by defendant The Penn Mutual Life Insurance Company on the life of Charlie F. Towne, deceased. The company defended on the ground that deceased had misrepresented and concealed material facts in his application for a policy. Plaintiff appeals from the judgment ordering that the insurance contract be cancelled and rescinded and that plaintiff recover only the sum of $841.73 representing premiums paid.

In August of 1952 deceased applied to respondent for a policy of life insurance in the sum of $50,000. As part of his examination by respondent's medical examiner he was asked the following questions, among others, and gave in writing the answers set forth:

"4. (a) When did you last consult or receive treatment for your health from any physician, surgeon or practitioner?

"June 1952.

"(b) For what reason? (Give details.)

"Routine physical examination.

"(c) Give name and address.

"Dr. J. Lawrence Brown, 384 Post, S. F.

"(d) State name of every other physician, surgeon or practitioner who has attended or treated you or whom you have consulted for any reason or ailment, serious or not serious, within the past five years. (Give all dates and details.)

"No.

"(e) Are you in good health? Yes.

"5. Have you ever had a health or physical examination? (Give dates, reasons and names and addresses of persons who made examinations.)

"Yes—above.

"6. Answer 'Yes' or 'No'—Under details give dates, reasons and names of physicians, surgeons or practitioners consulted.

"(a) Have you ever been advised to change, or have you ever changed residence or occupation for health reasons?    (a) No

"(b) Have you ever been X-rayed for diagnostic purposes or for treatment of disease?    (b) Yes

. . . . . . . . . . . .

"8. Has there been any suspicion of, or have you ever had or been treated for any of the following diseases or ailments (Answer each separately—give details below)

"(a) Convulsions, dizzy spells, apoplexy, nervous
breakdown or any nervous trouble?                    (a) No
"(b) Asthma, pleurisy, sinus trouble, spitting of
blood or tuberculosis?                               (b) No
.   .   .   .   .   .   .   .   .   .   .   .   .
"(d) Palpitation or heart, shortness of breath,
pain in chest, abnormal pulse, any disease of the
heart or blood vessels or a high blood pressure?     (d) No
.   .   .   .   .   .   .   .   .   .   .   .   .

"11. Have you ever had any illness, disease, operation or
injury other than as stated by you above? (If so, give full
particulars, date, duration, severity, etc., of each. Use re-
verse side if necessary.)

"Fracture Right Ankle. 1905."

The deceased further stated that he had had the X-ray re-
ferred to in the answer to question 6(b) in 1945.

At the bottom of this questionnaire the following state-
ments were printed:

"I represent that the statements and answers in this Part
II are written as made by me to the medical examiner, are
full, complete and true and agree that they shall be a part
of the contract of insurance if issued.

"I waive (to the extent permitted by law) on behalf of
myself and any person who shall have or claim any interest
in any policy issued hereunder all provisions of law for-
bidding any physician or other person who has attended me,
from disclosing any knowledge or information thereby ac-
quired, and I hereby authorize such physicians or other per-
sons to make such disclosure."

This questionnaire form was signed by respondent's medi-
cal examiner as a witness and by deceased as the proposed
insured.

Dr. Jacks, respondent's medical examiner, testified that he
asked deceased the questions set forth on respondent's medi-
cal history form and wrote down the answers given by de-
ceased. He then asked deceased to read over the questions
and answers before signing the document, which deceased did.
Dr. Jacks then gave deceased a physical examination.

On October 6, 1952, respondent issued the life insurance
policy on deceased's life. On November 28, 1952, the insured
died. The cause of his death was acute heart failure.

The deposition of Dr. J. Lawrence Brown, the insured's
physician, was received into evidence. It appears from a

reading of this document that the insured did not enjoy the "good health" he claimed on his application for insurance. He either visited or was visited by Dr. Brown for professional treatment forty-seven times between December 29, 1948 and July 28, 1952. Most of these visits were in the years 1950, 1951, and 1952. Deceased received his last treatment on July 28, 1952. At that time his complaint was that he felt that he was fatigued and needed a hormone injection. On the application form he claimed to have last consulted a doctor in June of 1952 for a routine physical examination. Dr. Brown was constantly advising the insured to slow up and take it easy. On June 18, 1948, the insured had X-rays taken of his chest and stomach on the advice of Dr. Brown. On December 29, 1949, the insured was "short of breath and nervous." On January 3, 1950, he was "still somewhat short of breath." The same complaint was registered on January 13, 1950. At this time the insured was advised to have an X-ray and an electrocardiogram to check on his lungs and heart. March 10, 1950, the insured was "a little nervous but better." On January 23, 1951, the insured complained of having "blacked out" on two occasions. On January 30, 1951, he reported that he had coughed up some blood. October 8, 1951, Dr. Brown noted "some heart change" and advised the insured to slow up because of this heart change. On October 15, 1951, the doctor found the insured's heart tone to be better and advised him of this. The deposition also contains a record of many other complaints of the insured to his doctor of fatigue, nervousness, and too many colds.

Dr. Stewart Lindsay, the physician who performed an autopsy on the deceased, testified that his examination revealed a disease process in deceased's heart of many months' or years' duration. He further testified that in his opinion the heart condition that he found could account for or cause the symptoms and complaints of the deceased during his lifetime.

It appears that deceased had previously, in 1949 taken out a $15,000 life insurance policy with respondent company. In connection with the issuance of this policy respondent had contacted the insured's physician, Dr. J. Lawrence Brown, and had obtained from him a report as to his medical condition. (Dr. Brown was not contacted by respondent in regard to the 1952 policy prior to its issuance.) Respondent's medical director testified that he had this report before him when he was reviewing the insured's application in 1952 and

was aware from this report that in fact he had had an X-ray in 1948 rather than in 1945 as stated in the application. The medical director further testified that had he known of deceased's true medical history as revealed in the deposition of Dr. Brown that respondent would not have issued the policy in 1952.

At the conclusion of all the evidence the trial court, sitting without a jury, made and entered its findings of fact and conclusions of law. Finding 9 recites:

"(9) The court finds that under and by virtue of said written application for life insurance the said Charlie F. Towne, for the purpose of inducing the said defendant company to issue a policy and contract of life insurance on the life of said Charlie F. Towne, made false, fraudulent misrepresentations and concealments of material facts respecting his medical and health history in that he falsely and fraudulently misrepresented and concealed that he had never had spitting of blood nor had ever had shortness of breath and that the only health or physical examinations had by him was one in June, 1952, whereas, in truth, he had had spitting of blood, shortness of breath and had had many physical examinations, including one in December of 1949 or January, 1950, for shortness of breath, and one in January, 1951, for a blackout, and as set forth in the Court's Memorandum of Opinion herein, hereby referred to and made a part hereof."

Finding 12 is to the effect in part that respondent company had no information or reason to believe at the time of the issuing or the delivery of the policy that any of the statements in the application were untrue. It is appellant's first contention that there is no evidence to support either of these findings.

Appellant relies on those cases which hold that where an applicant for insurance is asked generally whether he has had or been treated for any disease or ailment, the failure to refer to temporary or minor indispositions is not material to the risk and will not avoid the policy. (*Ransom* v. *Penn Mutual Life Ins. Co.*, 43 Cal.2d 420, 427 [274 P.2d 633]; *Pierre* v. *Metropolitan Life Ins. Co.*, 22 Cal.App.2d 346 [70 P.2d 985]; *Wills* v. *Policy Holders Life Ins. Co.*, 12 Cal.App.2d 659 [55 P.2d 920]; *Travelers Ins. Co.* v. *Byers*, 123 Cal.App. 473 [11 P.2d 444].) However, this rule does not apply when the applicant is asked specific questions as to his medical history. (*California-Western States etc. Co.* v. *Feinsten*,

15 Cal.2d 413, 423 [101 P.2d 696, 131 A.L.R. 608]; *Iverson v. Metropolitan Life Ins. Co.*, 151 Cal. 746, 749 [91 P. 609, 13 L.R.A.N.S. 866]; *Pierre v. Metropolitan Life Ins. Co.*, *supra*, 22 Cal.App.2d 346, 349.) The distinction is clearly pointed out in the Pierre case where the applicant answered "no" to the following questions: 1. "Have you ever had paralysis . . .?" and 2. "Have you consulted a physician for any ailment or disease not included in your above answers?" The insured in that case had been treated for an abscessed throat and had for a few days a "functional rather than an organic paralysis." The court said (22 Cal.App.2d 349):

"The wording of the question may be important in determining the falsity of the answer. The first question inquired as to a specified disease, while the others were asked concerning any ailment or disease. An answer to a question as to whether an applicant had ever had a specified disease is material and, if false, avoids the policy. (Citation.) Since the words 'ailment or disease,' as used in an application, are understood to mean something more than a minor or temporary indisposition, which is easily forgotten, and to refer to substantial or appreciable disorders, which affect his general health, an answer, relative thereto, which fails to disclose a minor or temporary ailment is not considered to be false. (Citations.)"

The court then proceeded to hold that the failure to disclose the illness involving the abscess of the throat in answer to the general question about other "ailment or disease" was not material on the ground that it was minor and temporary. Turning to paralysis as to which a specific question had been asked the court ruled (p. 350): "Although Dr. Thurlow who cared for this paralysis expressed the opinion that the ailment was minor, yet the insured's denial of having had paralysis was a material representation, since the insurer's question showed it considered it material and the insured's answer thereto evidenced his assent to the insurer's view. (Citation.) The insured's answer that he had never had paralysis was a false representation of a material fact, which avoided the policy. . . ."

The insured was asked the specific questions: ". . . have you ever had or been treated for . . . (b) . . . spitting of blood . . . (d) . . . shortness of breath . . .?" He had reported to his own physician spitting of blood and shortness of breath. His negative answers to these specific questions

were under the above rule material and the trial court properly so held. ■ If false representation as to material matters have been made the existence of a fraudulent intent to deceive is not essential. (*California-Western States etc. Co.* v. *Feinsten, supra,* 15 Cal.2d 413, 423.) In the face of these representations others also found by the court are not necessary to support the judgment.

It is idle for appellant to argue that there is no evidence to support the finding that the insured knew these facts since the evidence is clear that it was he who reported them to his physician.

There was no duty cast on the insurer to investigate the facts or to consult the insured's physician. "It was not incumbent upon respondents to investigate Mr. Robinson's statements made to the examiner. It was his duty to divulge fully all he knew. No authority is cited and none will be found holding that an insured or his beneficiaries may escape the consequences of his deception by placing upon the insurer the burden of investigating his verified statements." (*Robinson* v. *Occidental Life Ins. Co.,* 131 Cal.App.2d 581, 585 [281 P.2d 39].)

The insurer, with the insured's doctor's report of 1949 before him, knew that the insured had had an X-ray of the lungs in 1948, instead of in 1945 as stated in his answer to that question. Appellant asserts that respondent knowing that one of the assured's answers was incorrect and having discovered one error was bound to investigate the truth of all other statements. It may be conceded that if the insurer had actual notice of a material misrepresentation it could not rescind on the ground of that misrepresentation. (*DiPasqua* v. *California etc. Life Ins. Co.,* 106 Cal.App.2d 281 [235 P.2d 64].) ■ But the insurer with knowledge that one of the applicant's answers is erroneous may, if it chooses, waive that fact and is not thereby estopped from raising other misrepresentations. (*Maggini* v. *West Coast Life Ins. Co.,* 136 Cal.App. 472 [29 P.2d 263].) The applicant had disclosed the fact of the X-ray having been taken (the important fact) and the insurer may well have regarded the mistake in date as an unintentional fault of memory and regarded it as unimportant. It cannot be held to have put the insurer on notice that the insured was deliberately concealing other material facts.

Appellant charges that respondent attempted to suppress certain evidence vital to this action and that it was guilty of

unclean hands. It appears that appellant's counsel and a representative of respondent called on Dr. Brown, deceased's physician, some time prior to the trial. It was agreed that respondent's representative would take the doctor's file on the insured and have photostatic copies made of records contained in that file. The file was subsequently returned to the doctor. At the time the doctor's deposition was taken, on July 8, 1954, appellant's counsel discovered in questioning the doctor that a portion of the file was missing. Respondent's attorney stated he would check with respondent's representative to see what it was that appellant's attorney was inquiring about. On the first day of the trial of this matter, September 13, 1954, appellant's counsel stated that he would like to have the papers taken from Dr. Brown's file. Respondent's attorney replied he would bring what was requested in the morning. He did so and the papers were received into evidence as appellant's exhibits.

The papers were supplied and were used as appellant's exhibits and no authority is cited that respondent should be deprived of the judgment to which it is otherwise entitled by this incident.

Appellant's next contention is that the court's memorandum opinion is inconsistent with some of the findings, is contrary to law, and is unsupported by the evidence. For the most part appellant repeats his previous arguments in making this contention. Appellant seems to argue that the court was under the erroneous impression that any false answer of the insured to a question material to the risk would vitiate the policy, whether the false answer was intentional or unintentional on the insured's part. However, a fair reading of the court's opinion as a whole shows that it was aware that the insured must himself know the truth about the situation before a false answer given by him to a material question can be used to avoid the contract. Here it found on the evidence presented that the insured did have such knowledge. Thus nothing contained in *Brubaker* v. *Beneficial etc. Life Ins. Co.*, 130 Cal.App.2d 340 [278 P.2d 966], would seem to compel a result different from the one here obtained.

Appellant's last contention is that the trial court erred in striking certain testimony of Dr. Brown, the insured's physician. Dr. Brown was asked by appellant's counsel:

"Q. From your knowledge of the patient up to August 18, 1952, Doctor, would you say that you felt at that time he was an insurable risk?"

He answered: "A. Well, I never actually gave that any consideration but I thought—I imagine that I would have from my records here."

No error was committed in striking this question and answer on respondent's request. The issue presented was whether if respondent had known the true facts about the insured's health it would have issued the policy. Thus it would seem to be immaterial whether or not the insured's physician considered him to be an insurable risk. Further, it cannot be used to show the insured's good faith in giving his statement to the medical examiner, as appellant urges it might, in view of the fact that he knowingly answered specific questions falsely. This is not a situation where the insured was asked his opinion as to his general health or as to whether or not he considered himself to be an insurable risk. It might be admitted that if such were the case then his own physician's opinion on these matters would be relevant.

Judgment affirmed.

Nourse, P. J., and Kaufman, J., concurred.