The **NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, Appellant,**

v.

Verda A. GOREY, Appellee.

No. 15442.

United States Court of Appeals Ninth Circuit.

Nov. 6, 1957.

Rehearing Denied Dec. 10, 1957.

John C. Morrow, Ovila N. Normandin, Los Angeles, Cal., for appellant.

L. E. McManus, Rivera, Cal., for appellee.

Before FEE, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

Verda A. Gorey, widow of George E. Gorey, resident of California, sued the defendant insurance company, a Tennessee corporation, on its policy numbered 2081957, issued on the life of her deceased husband on April 30, 1954, during his lifetime.[1] The defendant pleaded several defenses in support of its refusal to pay, and moved for a directed verdict. This was denied by the trial court. The jury's verdict favored plaintiff. Defendant moved for a judgment non obstante veredicto, which was denied.

The facts are largely undisputed. As plaintiff's case in chief, she introduced in evidence the policy, together with a stipulation of facts. Attached to the policy, and made a part thereof, was an "Application for Insurance," signed by George E. Gorey as of April 14, 1954. That application contains in Part IV the following printed questions and written answers, the latter having been inserted by the company's agent who sold the policy (one Haws):

> "Q. 54 Have you ever had any ailment or disease of: * * * B. Heart or lungs. Yes or No. A. No.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> "Q. 60 State names and addresses of physicians you have ever consulted and give the occasion by reference to question numbers and letters above. A. None."

The application further contains in Part VI, above the decedent's signature, the following:

> "62. On my own behalf and on behalf of any person who may have or claim any interest in any policy issued hereon: (1) I hereby declare that each of the statements contained herein is full, complete, true and without exception, unless such exception is noted."

None was noted.

George E. Gorey, died on November 19, 1955, nineteen months after the policy was issued. The death certificate in evidence showed, and it was stipulated, that

1. 28 U.S.C.A. § 1332.

the "disease or condition directly leading to death" was "acute myocardial infarction," and the antecedent cause was given as "coronary arterio-sclerosis." The death certificate shows that the approximate interval between onset of "cause," and death was "2 yrs." There was no autopsy.

Defendant introduced evidence in support of its defenses. It was stipulated at pre-trial that on October 21, 1953, twenty-five months before death, and six months before the policy was issued, R. R. Kerchner, Sr. a physician licensed by the States of Ohio and California, was consulted by the decedent George E. Gorey in a professional capacity for the first time. (Dr. Kerchner, Sr. had been the Gorey family physician prior thereto, and had known George Gorey for ten or twelve years, but had not treated him professionally.)

On said October 21, 1953, Mr. Gorey complained to Dr. Kerchner of pain and a feeling of numbness, particularly in his left arm, produced by heavy work and excessive exertion. He had symptoms of angina (pain over the chest), which had endured for the previous month or six weeks. Dr. Kerchner saw the defendant again on October 27, 1953, and on October 31, 1953. A complete physical examination was made on the first visit. An electrocardiogram and chest X-rays were taken by Dr. Kerchner on the second visit. They were introduced in evidence, as were the Doctor's office records substantiating his testimony.

Dr. Kerchner made a tentative diagnosis of "coronary insufficiency, coronary heart disease," on October 27, 1953. He desired consultation, and sent the electrocardiogram to Travis Windsor, M.D., a heart specialist. The specialist's written report (dated October 28, 1953, and in evidence), disclosed a normal tracing before exercise, but shifts after exercise "very strongly suggestive of coronary insufficiency."

Dr. Kerchner, on October 31st, 1953, then made a final diagnosis of Mr. Gorey's condition, "while he was present," of "coronary heart disease, probably not too severe, * * * not too far advanced. I. * * * prescribed * * * lighter work, less forceful exercise, discontinuing smoking and overeating * * *" He explained to Mr. Gorey his diagnosis. "I told him [in] lay terms." He prescribed "nitroglycerin tablets to carry with him to be used as needed. * * * I also advised him to come in in six months for another repeat electrocardiogram or before if his condition became more severe."

Mr. Gorey never returned to Dr. Kerchner with any heart complaints, but did return, in March 1954, for treatment of a twisted knee; and on August 15, 1954 for occipital headaches. On neither of these subsequent visits did Mr. Gorey complain of his heart, nor did Dr. Kerchner treat or examine his heart.

It was stipulated between the parties, among other things, (1) that the policy in evidence was issued by the defendant; (2) that the decedent had made all premium payments becoming due under its terms, prior to his death; (3) that plaintiff gave due notice and proof of death, and notice and proof of the sum claimed due under the policy (i. e., $8,824); (4) that the defendant relied (a) upon the application, (b) the report of its own medical examiner (Groff), and (c) the Retail Credit Company inspection report of its agent; (5) that the application and the policy each provided that the policy would become effective only after delivery thereof to the insured during his lifetime and good health; (6) that defendant has denied liability for any sum other than premiums paid plus interest, (computed at $168.07) which sum it tendered to plaintiff; (7) that defendant relied on the application and on the answer to Questions 54 and 60 contained therein; (8) that defendant's medical examiner Dr. Groff examined the decedent on April 20, 1954, that his report was on the reverse side of the application for insurance, that it was delivered to defendant prior to the issuance of the policy, and that defendant relied in part on said report in issuing the policy to Gorey.

There was testimony by answer to plaintiff's Interrogatory Number 6 that no other records, information, or reports, other than those described in 4(a), (b) and (c) above were available to, or relied upon, by appellant company.

Plaintiff produced no evidence that the application had been signed in blank by the decedent, nor that the insurance agent had answered any of the questions in a way other than as the decedent had given him the information. An inference that such evidence might be produced was raised by the questions asked of defendant's President, through plaintiff's Interrogatories Numbers 4 and 5,[2] which were read to the jury.

▮ Neither party called the insurance agent Haws, whose last known address, known to both plaintiff and defendant, was in Utah. Neither party called the defendant's examining doctor, Sutten H. Groff, M.D., whose address was in Montebello, California. Since the information purportedly given by the decedent in reply to questions purportedly asked of him by Dr. Groff was part of the application which was not made part of the policy, it cannot be the basis of any charge against Gorey of false statements, or misinformation. The information, whether correct or incorrect, merely goes to the issue of what information and knowledge the defendant had and relied upon in issuing its policy. The only information obtained by Dr. Groff, and contained in the application, which is pertinent on this issue, was as follows:

"The chest must be bared for examination of lungs and heart. Heart must be examined before and after exercise.

\* \* \* \* \* \*

"8 D. Do you find the heart's action uniform, free and steady, and the sounds and rhythm regular and normal?

"D. Yes.

"E. Does physical examination reveal anything abnormal in the condition or functions of heart or blood vessels?

"E. No.

"F. Has proposed insured ever undergone an electrocardiogram? (Give details under remarks.)

"F. No.

\* \* \* \* \* \*

"13 From your inquiry and examination do you find anything that is likely to affect the insurability of this risk that is not mentioned elsewhere in this report?

"(Ans.) No.

\* \* \* \* \* \*

"15E. How do you rate the risk—First Class—Average—Poor?

"(Ans.) first class

"16 If Parts I–VI inclusive have been filled out, have you verified the answers to Part IV and Questions 5 and 6 of Part I?

"(Ans.) Yes."

▮ This court is bound by the law of the state where the insurance contract was issued. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; John Hancock Mut. Life Ins. Co. v. Yates, 1936, 299 U.S. 178, 57 S.Ct. 129, 81 L.Ed. 106. Both sides have tried the case on the assumption that Cali-

2. "Interrogatory 4. Do you know in whose handwriting or do the records of the defendant disclose in whose handwriting the answers to the questions on the application for life insurance policy No. 2081957 were made. Answer. I do not know in whose handwriting the answers to the questions in the application for said policy were made and the records of the defendant do not disclose this information.

"Interrogatory 5. If the answer to the preceding interrogatory is affirmative in whose handwriting were the answers made, and are the answers in the handwriting of more than one person. Answer. I do not know whether or not the answers to said questions are in the handwriting of more than one person." [R. 98.]

fornia law governs, and we will make the same assumption. Feld v. Continental Cas. Co., 1942, 19 Cal.2d 614, 122 P.2d 513.

 Words found in a recent California case are applicable here. Cohen v. Penn Mutual Life Ins. Co., 48 Cal.2d 720, 724, 312 P.2d 241, 243. The Supreme Court of California, on June 21, 1957, subsequent to the trial of this action in the District Court, stated as follows:

"It indisputably appeared from defendant's witnesses that the policy to the deceased was issued in reliance on the truth of his representations in his application for insurance; that had the facts disclosed by the * * * (prior) examination been known to the defendant the policy would not have been issued; * * * that if the deceased had truthfully stated his medical history, a full investigation would have been made, and that defendant does not insure applicants * * *"

with the heart condition similar to that found by Dr. Kerchner to exist. The Cohen case goes on:

"Where an applicant for insurance is asked generally whether he has had or been treated for any disease or ailment, the failure to mention minor or temporary indispositions is not material to the risk and will not avoid the policy. Ransom v. Penn Mutual Life Ins. Co., 43 Cal.2d 420, 427, 274 P.2d 633; Pierre v. Metropolitan Life Ins. Co., 22 Cal.App.2d 346, 349, 70 P.2d 985. But the rule is otherwise when the applicant is asked specific questions as to his medical history, and false answers thereto will vitiate the contract. McEwen v. New York Life Ins. Co., 187 Cal. 144, 146–147, 201 P. 577; Iverson v. Metropolitan Life Ins. Co., 151 Cal. 746, 749, 91 P. 609, 13 L.R.A.,N.S., 866; San Francisco Lathing Co. v. Penn Mut. Life Ins. Co., 144 Cal.App.2d 181, 300 P.2d 715; Pierre v. Metropolitan Life Ins. Co., supra, 22 Cal.App.2d 346,

349, 70 P.2d 985. It has been specifically held that misrepresentations as to heart symptoms render an insurance policy unenforceable. California Western States Life Ins. Co. v. Feinsten, 15 Cal.2d 413, 423–424, 101 P.2d 696, 131 A.L.R. 608; Whitney v. West Coast Life Ins. Co., 177 Cal. 74, 80–81, 169 P. 997; Robinson v. Occidental Life Ins. Co., 131 Cal. App.2d 581, 585–586, 281 P.2d 39; Parrish v. Acacia Mut. Life Ins. Co., D.C.Cal., 92 F.Supp. 300, 302–303, affirmed 9 Cir., 184 F.2d 185. Where false representations as to material matters have been made, the existence of a fraudulent intent to deceive is not essential. Telford v. New York Life Ins. Co., 9 Cal.2d 103, 105, 69 P.2d 835.

"Section 334 of the Insurance Code provides: 'Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries.' Within the purport of this rule, the deceased was bound in good faith to communicate the material facts in the application for insurance. Ins.Code, § 332. The fact that defendant put the questions in writing and asked for written answers was itself proof that it deemed the answers material. O'Connor v. Grand Lodge A.O.U.W., 146 Cal. 484, 494–495, 80 P. 688; Maggini v. West Coast Life Ins. Co., 136 Cal.App. 472, 475–476, 29 P.2d 263; McEwen v. New York Life Ins. Co., 23 Cal.App. 694, 697–698, 139 P. 242. While the misrepresentations need not have any causal connection with the death of the insured, the nature of the misrepresentations here strikingly reflects the materiality of the information withheld."

It is true that in the Cohen case the claimant was a doctor. Here the claimant may have been ignorant of the niceties of medical expression and transla-

tion, as most laymen are, but he knew that he had pain in the region of the heart, that his heart had been examined, that he had been given medicine for pain in or about the heart.

The Cohen case continues:

"Although failure of an applicant to disclose a physical condition of which he is ignorant will not affect the policy (Travelers Ins. Co. v. Byers, 123 Cal.App. 473, 481, 11 P. 2d 444) and a layman might reasonably be excused, if, in disclosing information, he failed to understand the meaning of certain medical terms and for that reason omitted some fact in his medical history (Ransom v. Penn Mutual Life Ins. Co., supra, 43 Cal.2d 420, 426, 274 P.2d 633), this is not such a case. Here the deceased was himself a doctor, he knew his medical history with regard to his heart condition, and he concededly must have understood the terms used in the insurance application and the significance of his answers. He knew that within two years of making his application with defendant, he had been in the hospital for the purpose of diagnosis of abdominal pain and had consulted doctors in connection therewith; he knew that while in the Army he had had a special heart study by X-ray; he knew what an electrocardiogram was and that while in the Army, one had been made of his heart action; he knew that tachycardia meant rapid pulse and that hypertension meant high blood pressure; and he knew beyond any possible dispute that the Army had concluded that he suffered from tachycardia and high blood pressure, for his Army commission so stated and he had acknowledged the hypertension under oath. Yet in his application, the deceased denied all of these specific facts. While in Ransom v. Penn Mutual Life Ins. Co., supra, 43 Cal.2d 420, 427, 274 P.2d 633, it was indicated that the failure to disclose a *normal* electrocardiogram could be excused because obviously it did not affect the risk, here the electrocardiogram whose existence the deceased concealed was not normal but 'suggestive of heart disease.' In short, the medical history which the deceased submitted pictured a risk entirely different from that in fact involved. Parrish v. Acacia Mut. Life Ins. Co., supra, D.C., 92 F.Supp. 300, 303." Cohen v. Penn Mutual Life Insurance Company, supra, 48 Cal.2d at pages 726–727, 312 P.2d at pages 243–245.

Plaintiff urges that the defendant company's physician, Dr. Groff, found the decedent in good health, and that it can be inferred, and is a question of fact for the jury, whether the company relied upon such information, for it indicated that the decedent, having heart disease in October 1953, had completely recovered, and had no heart disease, in April 1954. This position is not well-founded for several reasons: (1) there is no evidence that the company ever knew of the pre-existing heart condition prior to Gorey's death, and hence had no opportunity to weigh conflicting medical diagnoses; (2) the fact of recovery inferred is contradicted by the death certificate recital as to the cause of death, and the length of the existence of such; (3) Dr. Groff had not been given a truthful, or at least an accurate, history of and by the decedent; (4) the uncontradicted testimony of defendant's witnesses that, entirely apart from Dr. Groff's examination and diagnosis, knowledge of Dr. Kerchner's examination and diagnosis would have caused a further investigation, if not an outright declination to issue any policy.

It is important to remember that defendant was entitled, not only to know that decedent was in good health when insured, but also was entitled to have before it, before issuing the policy, a truthful statement by the proposed insured of his medical history. If we assume, (as we do here because no evidence exists to the contrary) that there was no intent on the part of the decedent to deceive or defraud the insurance company, and that his answers were innocently,

though carelessly, given, his lack of intent to defraud is not controlling. The misstatement, according to the only evidence on the subject, was relied upon by the defendant, and did materially affect the defendant's willingness to accept the risk. The defendant asked for specific answers to two certain questions; the answers given were not true, and defendant was denied the right to determine for itself the matter of the deceased's insurability, and the underwriting risks it was willing to undertake. Robinson v. Occidental Life Ins. Co., 131 Cal.App.2d 581, 586, 281 P.2d 39, 42. This is a right that any insurer has, and must have.

■ There is an inference in the record and it was raised in argument that perhaps the company waived the inaccurate replies, by not investigating the answer "none" to the question, "State names and addresses of physicians which you have ever consulted." The basis of such argument is that the company should know that no one is in such perfect health as to "never have ever" consulted a physician. While thirty-one years of perfect health would be remarkable, the failure to consult a doctor in thirty-one years is not unheard of, nor an impossibility. Nor does such an answer imply that it must be, or is, false. Cohen v. Penn Mutual Life Ins. Co., supra, 48 Cal.2d at page 728, 312 P.2d at page 245.

■ As a matter of law, the evidence in this case shows that the deceased by incorrect and untrue answers misrepresented and concealed material facts; that defendant relied on such misrepresented facts, and issued its policy in reliance thereon. Because of this, the defendant's motion for a directed verdict or for a judgment n. o. v., should have been granted by the trial court. McEwen v. New York Life Ins. Co., 187 Cal. 144, 147, 201 P. 577; Whitney v. West Coast Life Ins. Co., 177 Cal. 74, 81, 169 P. 997; Pierre v. Metropolitan Life Ins. Co., 22 Cal.App. 2d 346, 349, 70 P.2d 985; Maggini v. West Coast Life Ins. Co., 136 Cal.App. 472, 476, 29 P.2d 263; Parrish v. Acacia Mutual Life Ins. Co., D.C.Cal., 92 F.Supp. 300, 303, affirmed 9 Cir., 184 F.2d 185; Cohen v. Penn Mutual Life Ins. Co., supra; John Hancock Insurance Co. v. Yates, supra. This requires reversal.

It is not necessary here to go into the questions raised by the appellant with respect to the giving, and the failure to give, certain jury instructions. Suffice it to say that the evidence discloses no "expert witness," qualified as such.

Two doctors of medicine did testify. Dr. Kerchner testified largely as to the facts, i. e., his treatment of the deceased, the latter's complaints, and his own diagnosis. He defined certain medical terms, and to that extent may necessarily have been an expert witness. While diagnosis may involve an expert's opinion, it was admissible and introduced here, not to prove the truth of that diagnosis, but the fact that that certain diagnosis had been made and explained (to the extent it was) to the decedent.

Dr. Miller, Medical Director for the defendant insurance company, testified by deposition. He answered one hypothetical question.[3] This related to the materiality to the company of knowledge of the October 1953 diagnosis of heart disease, as confirmed by the electrocardiogram. Such information, he stated, would have resulted in rejection and declination of the policy had the insurance company had this knowledge, because it rendered "the applicant an uninsurable risk for life insurance by this company."

■ The instruction to the jury authorizing them to

" * * * consider each expert opinion received in evidence in this case and give it such weight as you think it deserves; and you may reject it entirely if you conclude the reasons given in support of the opinion are unsound, * * *"

was, standing alone, and without further explanation, an invitation to the jury to ignore entirely the factual testimony of

---

3. Asked, Tr. p. 94; answered, Tr. p. 102.

the two doctors. This was error. In view of our principal holding, we need not determine if it was reversible error.

The judgment is reversed, with direction to enter judgment for the appellee in the sum of $168.07 (the amount the appellant company has heretofore tendered).