[S. F. No. 7553. Department Two.—December 28, 1917.]

ANNA ST. JOHN WHITNEY, Respondent, v. WEST COAST LIFE INSURANCE COMPANY (a Corporation), Appellant.

LIFE INSURANCE—ACTION ON POLICY—FRAUD AS A DEFENSE—CONCEALMENT BY INSURED—EVIDENCE—NEW TRIAL.—In an action on a life insurance policy, evidence examined and found to warrant the defendant's contention on an appeal from a judgment and order denying a new trial, that the insured intentionally concealed from the examining physician of the defendant insurance company, at the time he applied for the policy, the fact that about two years before he had consulted a physician, who had diagnosed certain ailments of which he complained as a form of heart disease called myocarditis, of which he died, and three or four months before his application had consulted another physician, a kinsman, in relation to the same ailment.

ID.—FRAUDULENT CONCEALMENT — INSTRUCTED VERDICT FOR DEFENDANT SHOULD HAVE BEEN DIRECTED.—Where in an action against a life insurance company on a life insurance policy uncontradicted evidence shows that the insured consciously and intentionally withheld from the examining physician of the company at the time of his application information which would probably have prevented the issuance of the policy, the jury should have been instructed to find for the defendant.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Daniel C. Deasy, Judge.

The facts are stated in the opinion of the court.

Myrick & Deering, and James Walter Scott, for Appellant.

Norman A. Eisner, and T. C. Van Ness, Jr., for Respondent.

MELVIN, J.—Defendant appeals from a judgment for ten thousand dollars on a policy of life insurance and from an order denying a motion for a new trial.

The defense was that Arthur L. Whitney, the assured, had made false representations in his application for the policy. The application was signed on the last day of the year 1913. By the terms of the policy all insurance thereunder was based upon the written and printed application therefor which by attached copy was made a part of the contract. Mr. Whitney died June 10, 1914, of acute myocarditis, a disease of the heart.

By his answers to questions contained in the application for insurance Mr. Whitney made, among others, the following representations:

"Have you now or have you ever had . . . Asthma or Shortness of Breath, Answer, No; Disease or Palpitation of the Heart, No. . . . Give particulars of any injury or illness or attendance of physician that may have occurred during the past seven years. Burn of arm and chest. Date 1911. Duration, one week. Physician consulted, Dr. Chidester.''

The defendant introduced Dr. Cheney as a witness. He testified that Mr. Whitney had called upon him at his office about two years before the application for insurance was made. At the time of that visit Mr. Whitney had complained of a pain in his chest when he walked rapidly. He had noticed such pain under like circumstances about two years before he visited the doctor, but it had been growing more severe, so that on walking a short distance the distress would come on. The patient said that the pain was always worse after eating. Dr. Cheney said, among other things: "After this physical examination that I gave Mr. Whitney and after his statement to me of his past history of his case, and of the symptoms, I came to the conclusion that he was suffering from myocarditis. That is weakness of the heart, degeneration of this muscle of the heart. I did tell that to Mr. Whitney at that time. I told him that he had, in my opinion, a weakness which we call myocarditis.'' The doctor was testifying largely from his notes made at the time of Mr. Whit-

ney's visit. Regarding the patient's reception of the physician's diagnosis he said:

"I cannot tell you from my notes what Mr. Whitney replied. From my memory he told me that he had suspected that, because of the pain running down his arm, that he knew the meaning of that symptom. That is my recollection of the conversation, although it is not so set down here. Other discussion upon this subject was simply the directions that followed for him to observe. I did give him directions. I advised him to curtail his diet, to curtail his tobacco, to exercise moderately, and to avoid extremely hot and cold baths, and I gave him a medicine to take containing digitalis, a heart stimulant. This was partly on the 22d and the 23d; I saw him two days in succession. I saw him next on the 25th. These interviews took place in my office in the Shreve Building. Mr. Whitney called there. I prescribed the digitalis for Mr. Whitney on the 25th. I next saw Mr. Whitney on February 9th, at my office. Mr. Whitney called there. He reported that he had had no appearance of his distress since. I made an examination of him on the 9th of February, 1912, merely to take his weight and to count his pulse. His pulse at that time was 76. His weight 159 pounds. I do not know what Mr. Whitney's height was; my notes do not show."

Dr. Cheney also testified: "That condition which I found in Mr. Whitney in January and February, and June, that disintegration of his heart, was of such a character that it would be likely to continue up until June, 1914, if the diagnosis was correct; it is an incurable condition; it would persist as long as he lived. If Mr. Whitney died of myocarditis on June 10, 1914, that would convince me of the correctness of my diagnosis of January, 1912, and that it had never been cured."

It was also shown that Mr. Whitney had consulted his nephew, Dr. A. W. Hewlett, of Michigan, who was visiting in San Francisco. Dr. Hewlett testified, in part, as follows: "I told him that his physical condition, his general condition, was good, but nevertheless in my opinion he probably had weakness of his heart muscles. I gave him that as an opinion.

"Q. Did you explain to him the nature of any heart disorder that might not be visible by examination?

"A. No, I did not.

"Q. Did you say to him that his disorder was serious at all? Did you lay any serious stress upon it?

"A. I did not lay any serious stress; no.

"Q. Did you treat the matter lightly?

"A. I treated it quietly. I did not tell him there was nothing the matter with him, but I tried not to alarm him in any way, because I thought that would be bad for him.

"Q. Was he in any manner alarmed?

"A. He was not; no."

Dr. Hewlett's examination of Mr. Whitney was either in August or September of 1913, three or four months before the latter made application for insurance. Describing his visit to Mr. Whitney's office, Dr. Hewlett said: "He asked me to come down and look him over. At that time he said that he had been told or had reason to think that he might possibly have some trouble with his heart, and he asked me to examine his heart. I don't remember any part of what was said in regard to what he had to state in regard to the reason for calling me down, but on questioning him I found that he said that he had become somewhat short of breath when he exerted himself, and that he noticed this particularly if he had been eating a large meal, and particularly that his stomach seemed full, and that by dieting—he had been placed on a diet by Dr. Cheney—by dieting he was more or less able to avoid this distress that he had."

In view of this evidence appellant insists that, as matter of law, Mr. Whitney was guilty of fraud in securing the policy of insurance, in that he concealed from Dr. Hill, the defendant's medical examiner, the fact that he had consulted Doctors Cheney and Hewlett and the results of their examinations as reported to him. Appellant insists that in view of his false answers and the fraud thereby perpetrated, the jury should have been instructed to find for the defendant, citing *Westphall* v. *Metropolitan Life Ins. Co.*, 27 Cal. App. 734, [151 Pac. 159], *Madsen* v. *Maryland Casualty Co.*, 168 Cal. 204, [142 Pac. 51], *Iverson* v. *Metropolitan Life Ins. Co.*, 151 Cal. 746, [13 L. R. A. (N. S.) 866, 91 Pac. 609], *McEwen* v. *New York Life Ins. Co.*, 23 Cal. App. 694, [139 Pac. 242], and *John Hancock Mutual Life Ins. Co.* v. *Houpt*, 113 Fed. 572.

Respondent calls attention to the fact that the applicant for insurance was a man of active habits and athletic accom-

plishments. He was a manufacturer of salt, having his factory and his home in San Mateo County and his office in San Francisco. Up to a time within a month of his death it was his habit to arise at 5 o'clock in the morning, to walk about a mile to the salt works, and after spending half an hour there to take the train for San Francisco, arriving at his office before half-past 8. He exercised much and was especially fond of walking. Up to ten days before his death he practiced that form of strenuous calisthenics known as "setting up exercises." None of the people who had most abundant opportunities to observe him—his wife, his son, his stenographer, nor his closest friends—had ever observed any abnormal shortness of breath nor had heard him complain of any ailment. Mrs. Whitney had been spending half a year in Europe and her husband crossed the continent to meet her. Reaching Chicago on the return journey on May 28, 1914, Mr. Whitney had an attack of acute dysentery which continued, from time to time, until his death on June 10, 1914. On reaching San Francisco he consulted Dr. Chidester regarding dysentery and tonsilitis. The cause of death, as given by Dr. Chidester's certificate, was acute myocarditis and acute dilations of the heart. The certificate gave the date of the first symptoms of the fatal disease as about June 3d.

Under these circumstances, according to respondent's argument, the jurors were justified in concluding that any concealments or omissions to disclose facts about his past were made by Mr. Whitney without evil intention and were devoid of fraud. The burden was upon the defendant, says respondent, to show not only error in the applicant's statement, but *willful* error. (*O'Connor* v. *Grand Lodge A. O. U. W.*, 146 Cal. 484–494, [80 Pac. 688].) This burden, it is argued, was not met, and the evidence, taken as a whole, failed to show fraud on the part of the applicant for defendant's policy of insurance. Appellant bases its contentions largely upon the conclusion that Mr. Whitney was suffering from chronic myocarditis and that he knew it when he applied for insurance. It is true that Dr. Cheney diagnosed his case as one of chronic myocarditis, but it was in evidence that that disease is accompanied by sclerosis—hardening—of the arteries. Dr. Hill, who examined the applicant, found no sclerosis in the palpable arteries, nor had Dr. Cheney nor Dr. Hewlett discovered

any.   Dr. Charles Minor Cooper, the eminent specialist, who testified as an expert, said that it was *very rare* for one to have sclerosis of the internal arteries without the diagnostician being able to find some evidence of sclerosis in the palpable arteries.   But there was testimony that sclerosis may exist altogether in the arteries inside the body.

It is suggested that as the question answered by the applicant for insurance was whether or not he had suffered from "asthma or shortness of breath," it would be a natural conclusion by a person to whom such an interrogatory was propounded that the questioner meant shortness of breath of an asthmatic nature.   In an answer to such a question, says respondent, failure to recall and confess shortness of breath following violent exercise or overeating or excitement would by no means be a conclusive evidence of fraud.   (Citing *Rupert* v. *Supreme Court U. O. F.,* 94 Minn. 293, [102 N. W. 715].)

So with the question, "Have you ever had disease or palpitation of the heart?" the argument is that the applicant might well have construed the examiner's question to mean, "Have you ever had disease involving palpitation of the heart?"

Respondent calls attention to the form of the question, which was, "Give particulars of any *injury* or *illness* or *attendance* of physician that may have occurred during the past seven years," and insists that there is a distinction, particularly to the understanding of a layman, between "consultation" and "attendance," that Mr. Whitney may well have apprehended the interrogatory as relating to those occasions when he had been confined to his home by illness or injury and had been there visited by a doctor or a surgeon. He had consulted Dr. Cheney at the physician's office and his nephew had examined him at his own office in San Francisco.   It is true that in *Billings* v. *Metropolitan Life Ins. Co.,* 70 Vt. 477–482, [41 Atl. 517], the court said: "A mere temporary indisposition, not serious in its nature, such as indicated by the evidence on the part of the defendant, other than measles, cannot be considered an illness, and the mere calling into a doctor's office for some medicine to relieve such temporary indisposition, or the calling at the home of the insured by the doctor for the same purpose, cannot be considered an attendance by a physician, nor a consultation of

a physician, within the meaning of questions 3 and 7. 'Illness,' as used, means a disease or ailment of such a character as to affect the general soundness and healthfulness of the system seriously, and not a mere temporary indisposition which does not tend to undermine and weaken the constitution of the insured.'' Commenting on a similar question similarly answered, the Illinois appellate court said, in *Federal Life Assn. v. Smith*, 86 Ill. App. 427–431: ''She was not asked whether she had consulted a physician or received treatment from one. Doubtless, she understood the question as inquiring how long since a physician had waited on her in sickness at her home, and we think such understanding accords with the popular meaning of the expression.''

But, having in mind all of these liberal rules which properly favor the upholding of verdicts of this sort, the fact remains that by the uncontradicted testimony of two physicians of standing, Mr. Whitney is shown to have concealed facts about his condition and his consultations with medical men which could not have been unconsciously withheld. It is true that a presumption of intent to deceive, on the part of the applicant, is only raised when the statements are made with knowledge of their falsity. (*Aetna Life Ins. Co.* v. *Rehlaender*, 68 Neb. 284, [4 Ann. Cas. 251, 94 N. W. 129]; *Metropolitan Life Ins. Co.* v. *Larson*, 85 Ill. App. 143; *Dolan* v. *Mutual Reserve Fund Life Assn.*, 173 Mass. 197, [53 N. E. 398]; *Royal Neighbors of America* v. *Wallace*, 73 Neb. 409, [102 N. W. 1020].) But there are cases where the knowledge suppressed is so important and obviously so well in the recollection of the applicant that merely withholding it clearly amounts to fraud, such as the failure to disclose deafness (*Madsen* v. *Maryland Casualty Co., supra*), or epilepsy (*Westphall* v. *Metropolitan Life Ins. Co., supra*), or a stroke of apoplexy (*Iverson* v. *Metropolitan Life Ins. Co., supra*), or a serious accident from the kick of an animal (*McEwen* v. *New York Life Ins. Co., supra*), or disease of the throat (*John Hancock Mutual Life Ins. Co.* v. *Houpt, supra*). This is such a case.

It is impossible that Mr. Whitney could have forgotten so important an occasion as that on which he consulted his kinsman, Dr. Hewlett, a few months before he applied for insurance. Nor may we with reason believe that he could have lost all memory of his talks with Dr. Cheney and the course

of diet and the medicine prescribed by that physician. To say that he might have understood the questions regarding medical attendance as having reference to visits to his home is to doubt the intelligence of a business man accustomed to accurate methods. To decide that he might have apprehended the interrogatory about "shortness of breath" as having relation to an asthmatic affection is to credit him with a guilelessness which is the possession of no man of his age and experience. He had been afflicted with a shortness of breath which seemed to him so alarming as to cause him to seek the advice of a physician. This had happened not more than four months prior to the time when he sought life insurance. One of his physicians had told him that he was suffering from myocarditis, and while this portentous polysyllable may mean nothing to the average person who sees it in print, it is safe to say that the doctor also told him in plain English that there was some sort of trouble with his heart. We are, therefore, forced to the conclusion that he consciously and intentionally withheld from the examining physician information which might have prevented, nay, probably would have prevented, the issuance to him of a policy of insurance.

Of course, we cannot tell what new evidence may be forthcoming if the cause be retried, but unless some very positive proof be available to overcome the necessary deductions arising from the conduct of the assured, it would be the duty of the trial court to decline to submit the question of fact to a jury.

The judgment and order are reversed.

Henshaw, J., and Sloss, J., concurred.

Hearing in Bank denied.