[Civ. No. 20472.   Second Dist., Div. Two.   Mar. 18, 1955.]

LESLIE L. ROBINSON, Appellant, v. OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA (a Corporation) et al., Respondents.

Clock, Waestman & Clock and E. W. Sheridan for Appellant.

Frank M. Benedict for Respondents.

MOORE, P. J.—The question here posed is whether the widow of a veteran can collect his insurance where he had contracted with respondents for insurance on his life to be paid to the Department of Veterans Affairs at his death, and the veteran in his statement of insurability attached to the application, falsely answered inquiries relative to the condition of his health.

Charles Lindsey Robinson purchased a contract in the home protection plan of the Department of Veterans Affairs of California on July 14, 1951. He furnished the department with statement of insurability to accompany its written application to the insurance companies as a part thereof. Such statement contained three questions and the answers thereto as follows:

"7. Do you know of any impairments now existing in your health or physical condition? No.

"8. Have you had any illness or injuries during the past three years? No.

"9. Have you ever had any of the following: Consumption, Rheumatism, Disease of heart, lungs, stomach, kidney, liver, brain or any other chronic disease? No."

Following the completed statement, decedent certified that his "answers and statements are true and correctly recorded and that no material circumstance or information has been withheld or omitted concerning my past and present state of health or employment" and he consented that such statement be made a part of any application "for insurance on my life made by Department of Veterans Affairs."

The department applied to the Occidental Life Insurance Company of California, and California-Western States Life Insurance Company by written application for insurance on the life of its contractee. On August 21, 1951, he was examined by Dr. John B. Davis, a medical examiner for respondents. The doctor used a form entitled "Answers Made to the Medical Examiner," which document contains a statement that it is a continuation of and forms a part of the application for insurance. In answer to the *inquiry 16* as to the diseases, accidents or operations he had had, and for what conditions he had consulted a physician, he answered that he had suffered from virus pneumonia and had completely recovered in 1944 and that his attending physician was "U.S.N. Doctor," and that he had undergone a right inguinal hernioplasty in 1945 and was attended by "U.S.N. Doctor." Three other questions and their answers are as follows:

"17. Are you now in good health, as far as you know and believe? Yes.

"18. For what conditions have you consulted a physician or other practitioner within five years? Routine checkup. Dr. Walker, Long Beach, Calif. . . .

"23. Have you now, or have you ever had . . . any other disease or injury? Give details, dates, etc. #16 only."

These, also he certified to be complete and true.

The husband signed an authorization for Dr. Walker to disclose the contents of his findings, diagnosis and his treatment at the time of "the routine checkup," and when respondents requested the information of Dr. Walker, the latter replied "no disease," that Mr. Robinson had "reported for routine physical checkup—no complaints" and that he had attended his patient in February 1947 for a routine physical examination, but he made no mention of a vascular hypertension concerning which Mr. Robinson had consulted the doctor. The court found that in reliance upon decedent's declarations and representations made in connection with the application for the policy, Occidental and California-Western each agreed to issue a policy on his life for one half of the unpaid balance due on Robinson's contract with the department at the date of Robinson's death and to pay such amounts to the department; that such declarations were false and were known by Robinson to be false and were made for the purpose of deceiving respondents and of inducing them to issue such policies; that Robinson knew that in 1947, 1948, and 1949 he had suffered from vascular hypertension; had consulted a physician with reference to such condition within five years prior to the medical examination, and knew of the impairment of his physical condition, and knew that he was, in fact, in bad health.

Exactly 10 months and 11 days after respondents had approved the application, the unfortunate veteran died—August 19, 1952. After appellant had notified the department of her husband's death, proofs of death were forwarded to respondents with a memorandum of the unpaid balance of decedent's contract, to wit $7,283. Following the prompt investigation by respondents, they rejected appellant's claim on account of the false representations made by the insured in his statement of insurability, and paid to the department $34.75, the total amount of premiums paid for the insurance.

Appellant contends that the findings are without evidential support. She argues that no proof was made that at the time of the application for insurance, Robinson was suffering from a heart condition, or that he had knowledge of any such condition. She points to the testimony of respondents' physician, Dr. Davis, to the effect that at the time of his examination, deceased's heart and blood pressure were normal, and to the testimony of Dr. Walker that Robinson's highest blood pressure was caused by infected teeth, a severe

myositis of the shoulder and a respiratory infection, and that the pain caused by such ills can cause a rise in blood pressure. She further contends that her husband was not asked as to whether he had high blood pressure, and points to the testimony of both physicians that high blood pressure is not a disease, and to testimony of Dr. Walker that on the last two calls deceased made on him, January 25, 1949, and August 8, 1951, his blood pressure was normal and that no treatment was given or required for any physical condition whatsoever.

It is evident that appellant does not understand the nature of respondents' claims. The charges against appellant are that her husband concealed a serious vascular hypertension, a knowledge of which would have required a rejection of his application for insurance. Dr. Davis testified that even though on the day of a person's examination, his blood pressure be normal, on a subsequent day he might have a hypertension and on a still later day his pressure might be perfectly normal; that a respiratory infection would not increase the blood pressure. Dr. Walker was decedent's physician from 1947 until decedent's death. From February 10, 1947 until August 8, 1951, decedent made 11 calls on his doctor. For that period Robinson's average blood pressure was 157 over 102, during which period Mr. Robinson was under the depressing influence of aminaphylline and phenobarbital. On the day of the first interview, February 10, 1947, prior to the use of the drugs, decedent's blood pressure was 180 over 108 as against a normal systolic count of 150 for a man of 60, decedent's age. The doctor testified that he informed Mr. Robinson in understandable language of his true condition. Both doctors, Davis and Walker, testified that in a man of 60, the high blood pressure probably indicated a pathological systemic condition, not one of emotional origin. Other expert proof was that a man with decedent's symptoms was such a poor risk as to make him unacceptable by an insurer.

The vice of the misrepresentations made by decedent would still be seriously grave, in appellant's quest for payment, even though decedent had perished in a storm at sea. The beneficiary of his policy is now face to face with material, fatal misrepresentations and concealments made for the purpose of inducing the issuance of an insurance contract. (*Whitney* v. *West Coast Life Ins. Co.,* 177 Cal. 74, 80 [169 P. 997]; *Mutual Life Ins. Co. of New York* v. *Hurni Packing*

*Co.*, 260 F. 641, 645 [171 C.C.A. 405] [certiorari denied]; *McEwen* v. *New York Life Ins. Co.*, 42 Cal.App. 133, 145 [183 P. 373].) Appellant cannot take advantage of the failure of her own physician to disclose the true facts when called upon for them. Especially is this true where the scope of such disclosure had been limited by decedent's instructions to only the physical examination of August 8, 1951.

The findings are not contrary to law. The representations made by decedent related to matters material to the contract. Deceased knew of his malady. His doctor had told him and he had suffered. It was his duty to communicate in good faith all such facts. (Ins. Code, § 332.) Not only did he fail to disclose what he knew but the misstated the facts that were directed to his attention. Their materiality is determined "solely by the probable and reasonable influence" of those facts upon respondents. (Ins. Code, § 334.) He is bound to have known that a high blood pressure was not popular with an insurance company. But at the time of his examination, he denied he had either illness or injuries during the preceding three years; he answered that he was in good health and concealed knowledge of his high blood pressure. In her zeal to keep the inquiry directed to the subject of her husband's heart trouble, appellant quotes both doctors, Walker and Davis, that there was no heart trouble as of August 8, 1951. Such was not the issue, but rather it was: had her husband concealed knowledge of his vascular hypertension from the insurance companies? They had a right to know all he knew on that subject whereby they might intelligently decide whether he was an insurable risk. (*Mutual Life Ins. Co.* v. *Hurni, supra.*) It was not incumbent upon respondents to investigate Mr. Robinson's statements made to the examiner. It was his duty to divulge fully all he knew. No authority is cited and none will be found holding that an insured or his beneficiaries may escape the consequences of his deception by placing upon the insurer the burden of investigating his verified statements. (*Layton* v. *New York Life Ins. Co.*, 55 Cal.App. 202, 205 [202 P. 958].)

For a candidate for life insurance to represent his health to be good, when in truth it was bad, to deny that he had consulted a physician within five years on account of his vascular hypertension, although he had done so; to conceal his knowledge of such vascular hypertension by saying only that within five years he had gone to a physician for a "routine

check-up'' were material to the contract for insurance and are fatal to recovery on the insurance policy. (*Maggini* v. *West Coast Life Ins. Co.,* 136 Cal.App. 472, 475 [29 P.2d 263].)

It was proved that prior to decedent's statements attached to the application for insurance, he had suffered a blood pressure of 180 over 108. That was hypertension. Such condition could cause a coronary occlusion, a rupture of a coronary artery or of a blood vessel in the body. The victim of such condition is not a good risk. Also, when such condition exists in a person, something may be organically wrong. Longevity is definitely affected by it. There was evidence that the blood pressure of decedent during the four-year period after February 10, 1947, indicated cardiac damage. ■ An insurance company is entitled to determine for itself what risks it will accept, and therefore to know all the facts relative to the applicant's physical condition. ■ It has the unquestioned right to select those whom it will insure and to rely upon him who would be insured for such information as it desires as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks. (*Mutual Life Ins. Co.* v. *Hurni Packing Co.,* 260 F. 641, 645 [171 C.C.A. 405].)

■ Finally, appellant's hopes for recovery were blasted by the rescission of the insurance contract prior to the commencement of this action. It is the law that ''a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it.'' (Civ. Code, § 1559.) The mutual rescission, as found, terminated the contractual rights of appellant.

Judgment affirmed.

McComb, J., and Fox, J., concurred.