[S. F. No. 19647. In Bank. June 21, 1957.]

ELIZABETH R. COHEN, Respondent, v. THE PENN MUTUAL LIFE INSURANCE COMPANY (a Corporation), Appellant.

Henry C. Clausen, Henry C. Clausen, Jr., Walker Lowry and McCutchen, Thomas, Matthew, Griffiths & Greene for Appellant.

Rockwell & Fulkerson and John L. Rockwell for Respondent.

SPENCE, J.—Plaintiff sued as beneficiary to recover on a policy of insurance issued by defendant on the life of her deceased husband. After a verdict in plaintiff's favor, defendant unsuccessfully moved for a judgment notwithstanding the verdict and judgment was entered on the verdict. Defendant appeals, claiming principally that its motion should have been granted because of the deceased's misrepresentations and concealment of material facts in stating his medical history. Since the record sustains defendant's position on this point, other alleged errors need not be considered.

There is no conflict as to the material facts. On September 10, 1949, the deceased, a 32-year-old physician, applied to defendant for the insurance policy. He answered the following questions, among others, in his application:

"4. (a) When did you last consult or receive treatment for your health from any physician, surgeon or practitioner? *10 years ago.*

"4. (d) State name of every other physician, surgeon or practitioner who has attended or treated you or whom you have consulted for any reason or ailment, serious or not serious, within the past 5 years. (Give all dates and details.) *None.*

"4. (e) Are you in good health? *Yes.*

"5. Have you ever had a health or physical examination? (Give dates, reasons, and names and addresses of persons who made examinations.) *U.S. Army induction 1944.*

"6. (c) Have you ever had a special heart study or an electrocardiogram? *No.*

"6. (d) Have you ever been in a clinic, hospital, sanatorium or asylum for observation, treatment or diagnosis? *No.*

"8. Has there been any suspicion of, or have you ever had or been treated for any of the following diseases or ailments:

"(d) Palpitation of heart, shortness of breath, pain in chest, abnormal pulse, any disease of the heart or blood vessels or a high blood pressure? *No.*

"11. Have you ever had any illness, disease, operation or injury other than as stated by you above? (If so, give full particulars, date, duration, severity, etc. of each. Use reverse side if necessary.) See Details. *Nothing other than usual childhood diseases.*"

Deceased certified that these answers were full, complete and true, and he agreed that they should form a part of the

contract of insurance. Thereafter a doctor selected by defendant examined the deceased and reported his condition as satisfactory. The policy was issued September 19, 1949; the application therefor was attached thereto; and together, they constituted the entire contract between the parties. The insured died of a heart attack while giving a lecture on June 1, 1950. The autopsy established the cause of death as "coronary arteriosclerosis, severe," with "old occlusion of left circumflex coronary artery. Subtotal occlusion of left anterior coronary artery. Anterior myocardial scar. Visceral congestion, moderate."

Proofs of death were filed with defendant and upon investigating the claim, defendant discovered the following facts relating to the deceased's induction into, and discharge from, the Army: That following application for a commission with the Army Medical Corps in 1943, the deceased was examined by Army doctors on seven separate occasions between October 1 and October 20 of that year, and that these examinations showed that he had a heart murmur, unstable blood pressure or intermittent hypertension and tachycardia or rapid pulse; that during this same period of 1943, the deceased had also had a special heart study by X-ray and an electrocardiogram —the latter being "definitely abnormal," in the opinion of one expert pointing to the coronary arteriosclerosis found at the autopsy, and according to another expert "suggestive of heart disease"; that in January, 1944, the deceased accepted a commission stating "Waiver is granted for unstable blood pressure, tachycardia, systolic apical murmur on physical examination report dated October 1, 20, 1943"; that following an examination of the deceased in the fall of 1944, the Army report stated: "Blood pressure this examination is of the same order as previously"; that thereafter on October 12, 1944, and preliminary to entering on active duty, the deceased executed a waiver acknowledging under oath that he had hypertension; and that in January, 1947, the deceased was relieved from active duty following a discharge in November, 1946, stating that he was "incapacitated for general or limited service" because of "hypertension." Defendant further discovered that in late 1947 or early 1948, the deceased, while an intern at the Michael Reese Hospital in Chicago, had been examined at the hospital because of abdominal pain.

It indisputably appeared from defendant's witnesses that the policy to the deceased was issued in reliance on the truth

of his representations in his application for insurance; that had the facts disclosed by the Army examination been known to defendant the policy would not have issued; that under defendant's standard practice, electrocardiogram, abnormal pulse records, and abnormal blood pressure readings are referred to home office doctors for review; that if the deceased had truthfully stated his medical history, a full investigation would have been made, and that defendant does not insure applicants with pulse and blood pressure readings such as those of the deceased at the time of his Army examinations. All the expert witnesses, both plaintiff's and defendant's, agreed that in order to determine the physical condition of a person under examination, it is essential that he tell the truth about his medical history.

■ Where an applicant for insurance is asked generally whether he has had or been treated for any disease or ailment, the failure to mention minor or temporary indispositions is not material to the risk and will not avoid the policy. (*Ransom* v. *Penn Mutual Life Ins. Co.*, 43 Cal.2d 420, 427 [274 P.2d 633]; *Pierre* v. *Metropolitan Life Ins. Co.*, 22 Cal.App.2d 346, 349 [70 P.2d 985].) But the rule is otherwise when the applicant is asked specific questions as to his medical history, and false answers thereto will vitiate the contract. (*McEwen* v. *New York Life Ins. Co.*, 187 Cal. 144, 146-147 [201 P. 577]; *Iverson* v. *Metropolitan Life etc. Co.*, 151 Cal. 746, 749 [91 P. 609, 13 L.R.A.N.S.]; *San Francisco Lathing Co.* v. *Penn M. L. Ins. Co.*, 144 Cal.App.2d 181, 186-187 [300 P.2d 715]; *Pierre* v. *Metropolitan Life Ins. Co., supra*, 22 Cal. App.2d 346, 349.) ■ It has been specifically held that misrepresentations as to heart symptoms render an insurance policy unenforceable. (*California-Western States etc. Co.* v. *Feinsten*, 15 Cal.2d 413, 423-424 [101 P.2d 696, 131 A.L.R. 608]; *Whitney* v. *West Coast Life Ins. Co.*, 177 Cal. 74, 80-81 [169 P. 997]; *Robinson* v. *Occidental Life Ins. Co.*, 131 Cal. App.2d 581, 585-586 [281 P.2d 39]; *Parrish* v. *Acacia Mut. Life Ins. Co.*, (Dist.Ct.Cal.) 92 F.Supp. 300, 302-303, aff. 184 F.2d 185.) ■ Where false representations as to material matters have been made, the existence of a fraudulent intent to deceive is not essential. (*Telford* v. *New York Life Ins. Co.*, 9 Cal.2d 103, 105 [69 P.2d 835].)

■ Section 334 of the Insurance Code provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his

estimate of the disadvantages of the proposed contract, or in making his inquiries.'' Within the purport of this rule, the deceased was bound in good faith to communicate the material facts in the application for insurance. (Ins. Code, § 332.) The fact that defendant put the questions in writing and asked for written answers was itself proof that it deemed the answers material. (*O'Connor* v. *Grand Lodge A.O.U.W.*, 146 Cal. 484, 494-495 [80 P. 688]; *Maggini* v. *West Coast Life Ins. Co.*, 136 Cal.App. 472, 475-476 [29 P.2d 263]; *McEwen* v. *New York Life Ins. Co.*, 23 Cal.App. 694, 697-698 [139 P. 242].) While the misrepresentations need not have any causal connection with the death of the insured, the nature of the misrepresentations here strikingly reflect the materiality of the information withheld.

Although failure of an applicant to disclose a physical condition of which he is ignorant will not affect the policy (*Travelers Ins. Co.* v. *Byers*, 123 Cal.App. 473, 481 [11 P.2d 444]) and a layman might reasonably be excused if, in disclosing information, he failed to understand the meaning of certain medical terms and for that reason omitted some fact in his medical history (*Ransom* v. *Penn Mutual Life Ins. Co.*, *supra*, 43 Cal.2d 420, 426), this is not such a case. Here the deceased was himself a doctor, he knew his medical history with regard to his heart condition, and he concededly must have understood the terms used in the insurance application and the significance of his answers. He knew that within two years of making his application with defendant, he had been in the hospital for the purpose of diagnosis of abdominal pain and had consulted doctors in connection therewith; he knew that while in the Army he had had a special heart study by X-ray; he knew what an electrocardiogram was and that while in the Army, one had been made of his heart action; he knew that tachycardia meant rapid pulse and that hypertension meant high blood pressure; and he knew beyond any possible dispute that the Army had concluded that he suffered from tachycardia and high blood pressure, for his Army commission so stated and he had acknowledged the hypertension under oath. Yet in his application, the deceased denied all of these specific facts. While in *Ransom* v. *Penn Mutual Life Ins. Co.*, *supra*, 43 Cal.2d 420, 427, it was indicated that the failure to disclose a *normal* electrocardiogram could be excused because obviously it did not affect the risk, here the electrocardiogram whose existence the deceased concealed was not normal but ''suggestive of heart disease.'' In short, the

medical history which the deceased submitted pictured a risk entirely different from that in fact involved. (*Parrish* v. *Acacia Mut. Life Ins. Co., supra,* 92 F.Supp. 300, 303.)

Plaintiff argues that the Army findings of hypertension and rapid pulse as part of the deceased's heart symptoms might be regarded as isolated instances which had completely disappeared by the time of his examination by the doctor selected by defendant upon deceased's application for insurance, in view of said doctor's failure to report any findings of heart trouble as of September, 1949, and the fact that prior to death in 1950, there was evidence that the deceased was apparently in good health and was then leading an active life. She further cites certain medical testimony in the record indicating that certain heart damage to the deceased could have occurred within the last three months of the deceased's life. In refuting plaintiff's arguments, defendant refers to the testimony of its expert witnesses that the autopsy examination indicated that the decedent had been suffering from arteriosclerosis "for many years," and the concession of plaintiff's cardiologist that he was unable to say how long the deceased might have had heart disease before his death. However, these considerations are not of controlling importance. Rather, the issue was whether the deceased had concealed his medical history concerning his heart and circulatory condition in making his application to defendant. Defendant had a right to know all that the deceased knew relating to the specific questions contained in the insurance application. (*Robinson* v. *Occidental Life Ins. Co., supra,* 131 Cal.App.2d 581, 585.) The importance which defendant attached to these answers, from both the appraisal of risk and the inquiry aspects (Ins. Code, § 334), was emphasized by its inquiry not only as to whether the applicant had the particular disease but whether he had "any suspicion of . . . abnormal pulse, any disease of the heart or blood vessels or a high blood pressure." This was plain warning that defendant would investigate any suspicious or doubtful circumstances which the answers might indicate. Nor does it matter what the deceased might personally have believed about his heart condition and its lack of substantial character. Defendant did not ask on the application for merely his evaluation of his physical condition, but also for a truthful statement of his medical history. (*California-Western States etc. Co.* v. *Feinsten, supra,* 15 Cal.2d 413, 423; *Telford* v. *New York Life Ins. Co., supra,* 9 Cal.2d 103, 108.) Defendant

was entitled to determine for itself the matter of the deceased's insurability, and to rely on him for such information as it desired "as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks." (*Robinson* v. *Occidental Life Ins. Co., supra,* 131 Cal.App.2d 581, 586.)

Plaintiff claims that defendant waived the fraud in the deceased's answers. To this point she first argues that the right to information may be waived by a failure to inquire as to facts which "are distinctly implied in other facts of which information is communicated." (Ins. Code, § 336.) This argument is untenable for it cannot be said that the fact that the deceased consulted doctors and was diagnosed in a hospital for abdominal pain within two years of his insurance application is "distinctly implied" in his answer that his last consultation with doctors was "10 years ago"; or that the fact that he had been examined repeatedly by Army doctors is "distinctly implied" in his answer that he was examined only once, "U.S. Army induction 1944"; or that the fact that he had had an electrocardiogram is "distinctly implied" in his answer that he had not had one; or that the fact that he had stated under oath that he had hypertension is "distinctly implied" in his answer that there had never "been any suspicion of . . . high blood pressure."

Plaintiff next argues that defendant waived the fraud by failing to search out the Army records when it was on notice that deceased had taken an Army induction examination. Because of the difficulty and the time consumed in obtaining military records, defendant customarily did not endeavor to obtain them unless the applicant's answers provided a reason for so doing. If the applicant's answers indicated a service connected disability or an examination which showed defects, defendant would request the applicant to produce his health record from the Army before processing the application. Specifically, the deceased's denial of an electrocardiogram, abnormal pulse records, and high blood pressure readings indicated that there was no need for defendant's search of the Army's findings. This is not like the situation involved in *Turner* v. *Redwood Mutual Life Assn.,* 13 Cal.App.2d 573 [57 P.2d 222], cited by plaintiff, where the insured disclosed an illness but failed, in good faith, to describe it with complete accuracy. It was held that since the illness was disclosed and the attending doctor identified as the source of any further information wanted, the insur-

ance company waived the misstatement in its issuance of a policy and could not claim fraud. But here the deceased denied any medical history at all bearing on the specific questions relating to his heart condition. In short, the deceased, like the insured in *Parrish* v. *Acacia Mutual Life Ins. Co., supra,* 92 F.Supp. 300, 302, "denied having the very symptoms that might have, if properly followed up and known to the defendant, indicated an unfavorable heart condition." It was not incumbent upon defendant to assume the falsity of the statements in deceased's application. (*Robinson* v. *Occidental Life Ins. Co., supra,* 131 Cal.App.2d 581, 585.)

■ Plaintiff finally contends that since defendant framed its pleadings on the basis of actual fraud—listing the deceased's false representations, claiming that they were made by the deceased for the purpose of deceiving defendant, and that defendant, without knowledge of their falsity, relied thereon in issuance of the policy (Civ. Code, § 1572)—the issue of the deceased's actual intent was tendered as a question of fact for the jury's determination. In this connection, plaintiff also refers to defendant's admission in the course of the trial that it was claiming "actual fraud," a "direct deception upon the contract." But such added factor in defendant's alleged ground for avoiding the insurance policy does not militate against its right to prevail, as a matter of law, on its claim that concealment of a material fact, whether intentional or unintentional, vitiates an insurance policy. (Ins. Code, § 331.) In line with this latter proposition, defendant at the outset of the case submitted an instruction stating that the "presence of an intent to deceive is not essential," which is a correct statement of the law. (*Telford* v. *New York Life Ins. Co., supra,* 9 Cal.2d 103, 105.) The allegation of an actual intent to deceive may be regarded as mere surplusage, unnecessary to prove and unessential to defendant's right to refuse payment on the insurance policy. It in nowise prejudiced or misled plaintiff in the presentation of her case. (*Gates* v. *General Casualty Co. of America,* 120 F.2d 925, 927; see also *Pigeon* v. *W. P. Fuller & Co.,* 156 Cal. 691, 699 [105 P. 976]; *Demetris* v. *Demetris,* 125 Cal.App.2d 440, 443 [270 P.2d 891]; *Karsh* v. *Haiden,* 120 Cal.App.2d 75, 83 [260 P.2d 633]; *Alonso* v. *Hills,* 95 Cal.App.2d 778, 784 [214 P.2d 50].) ■ Suffice it to say here that the uncontradicted evidence shows that, as a matter of law, the deceased, by false answers, misrepresented and concealed material facts, and that defendant in its dealings with him did

not waive such deception in issuing its insurance policy to him. Under such circumstances, defendant's motion for a judgment notwithstanding the verdict should have been granted. (*McEwen* v. *New York Life Ins. Co., supra,* 187 Cal. 144, 147; *Whitney* v. *West Coast Life Ins. Co., supra,* 177 Cal. 74, 81; *Pierre* v. *Metropolitan Life Ins. Co., supra,* 22 Cal.App.2d 346, 349; *Maggini* v. *West Coast Life Ins. Co., supra,* 136 Cal.App. 472, 479-480; *Parrish* v. *Acacia Mut. Life Ins. Co., supra,* 92 F.Supp. 300, 303.)

The judgment and the order denying the motion for judgment notwithstanding the verdict are reversed, with directions to enter judgment for defendant.

Shenk, J., Traynor, J., and McComb, J., concurred.

SCHAUER, J., Dissenting.—The majority opinion, in reversing the judgment for plaintiff with directions "to enter judgment for defendant," appears to me to have violated certain basic principles relative to (a) judgments notwithstanding the verdict and (b) the function of a court of review. As this court stated in *Brandenburg* v. *Pacific Gas & Elec. Co.* (1946), 28 Cal.2d 282, 284 [1] [169 P.2d 909] : "A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied. [Citations.]" And, "it is the established law that such a motion cannot be granted where there is a conflict in the evidence, although the conflict is such that the trial court is justified in granting a new trial notwithstanding it, as the motion must be based upon such a state of facts as will warrant the court in granting it without trespassing on the province of the jury to be judges of all questions of fact in the case." (*Hunt* v. *United Bank & Trust Co.* (1930), 210 Cal. 108, 120-121 [12] [291 P. 184].) The rules traditionally governing a court of review in resolving conflicting evidence are discussed *infra.*

In the case before us, as is hereinafter shown, the evidence was substantially conflicting. To reach its result the majority resolves conflicting inferences in favor of defendant and against sustaining the judgment. The jury was unanimous and required only 28 minutes of deliberation in determining

the issues in favor of plaintiff. Analysis of the record discloses adequate support for the jury's verdict.

There was ample evidence to the effect that the abdominal pain for which the decedent was examined at Michael Reese Hospital in 1947 or 1948 was merely a minor and transitory indisposition, unrelated to any prior or subsequent ailments. Plaintiff widow testified that the pain complained of was in the lower right quadrant of the abdomen, and that the decedent thought that it might be appendicitis; that at that time the decedent was working as a resident physician at Michael Reese Hospital and one day while at work he had some other member of the staff check into the complaint; that the findings of the examination were completely negative, and the decedent (a psychiatrist) dismissed the pain as psychosomatic. The decedent did not go to or stay in the hospital for treatment of any disease. As described by his wife "It was just an examination. He felt rather silly afterwards, the way anybody does when they find they don't have anything to back up a pain." The record before us contains medical testimony that a pain in the lower right quadrant of the abdomen is not a sign or symptom of heart disease. From the testimony it was readily inferable (and if we follow the law we must presume that the jury did infer) that the decedent believed that the abdominal pain was of minor and transitory significance, that the examination at that time was confined to the area of the pain and produced no signs of any ailment at all, that such pain was not at all related to the decedent's (later developed or discovered) heart disease, and that the nondisclosure to defendant insurer of the circumstances of that examination was not such a falsification or omission in the application as could invalidate the policy. (See *Ransom* v. *Penn Mut. Life Ins. Co.* (1954), 43 Cal.2d 420, 427 [274 P.2d 633].)

Similarly, there is evidence in the record from which the jury could legitimately have inferred that the nondisclosure of the details of the army medical records (even assuming they were known to the insured) was completely inconsequential and could not make the policy void. Resolving conflicts and drawing inferences in favor of the verdict, the following facts directly or inferentially appear:

The decedent, at least until a few months before his death, had "no knowledge" that he was suffering from heart disease; in "ten or fifteen percent" of the cases of arteriosclerosis no symptoms of the disease at all are manifested; the

irregularities in the decedent's heart as disclosed by the autopsy, apart from the arteriosclerosis, "could be attributed to development of the disease within the last three months" before death.

The decedent was not in fact suffering from high blood pressure; the army itself did not take the results of the electrocardiogram seriously, and the indications of the army physicals including the electrocardiogram could have been due to functional, as opposed to organic, causes such as "emotion or anxiety" at the time of taking the examinations. Fair statement of the facts before the jury requires also that we note that there was no evidence that the decedent knew the details of the medical reports other than the bare medical conclusions, but there was evidence that the decedent, being a medical man himself, and a psychiatrist, would tend to minimize the results of the tests and attach only psychosomatic or emotional significance to them.

An army practice of granting waivers was prevalent even though the defects waived were not serious and the individual "was qualified and physically fit to serve"; on the basis of an abnormal reading of pulse rate or blood pressure "on one occasion" the army would automatically classify the individual as having tachycardia or hypertension and require a waiver; and the insurance company did not pay a great deal of attention to army waivers or physicals where the individual was inducted, received a nonmedical discharge, and was not drawing disability benefits. In this connection it is to be noted that the company was informed at the time decedent applied for the insurance that he had been in service, had received a nonmedical discharge, was not drawing disability benefits, and had no service-incurred ailments. The truth of these facts is not disputed. Certainly it is to be inferred that an insurance company knows that a person who is accepted for active duty in the army, who serves in such capacity and is thereafter honorably discharged, has been the subject of various physical examinations.

The company gave great weight to the examination given by their own doctor, and his examination of decedent disclosed no indication of heart disease, high blood pressure, or abnormal pulse; none of the reports of the three independent investigators employed by defendant showed any indication of ill health past or present; and the decedent had been in good health for at least several years prior to his death and carried on activities not consistent with one who had or

believed he had heart disease. The jury could infer from these facts that decedent did not in fact have "heart disease" —and certainly was not aware that he did—at the time he applied for insurance, and, assuredly, that he had no ascertainable symptoms of the disease or reason for believing that he had it.

The company had a rule of thumb to check all reports of physical examinations within five years previous to the date of application for insurance and not to check reports of examinations before that time, but even then they did not always consider army physicals within the five year period; the company would not have given consideration to blood pressure or pulse readings taken more than five years prior to the application for insurance; all of the army physicals except the one at decedent's discharge from service (which disclosed no abnormal symptoms) were given approximately five years before the application was made; army medical records are "very, very difficult to get" and, even if more extended reference had been made to the army physicals by decedent, the company for economic reasons still would not have bothered to try to get those records where no service-connected disability was indicated. In the latter regard it should be noted that in response to question 6 (b) of the insurance application, which asked "Have you ever been X-rayed for diagnostic purposes or for treatment of disease?" decedent answered "Yes," and under "details" *referred to his army induction physical.* Despite this disclosure, there is no evidence that the company attempted to determine the reason for or result of the X-rays taken by the army.

From the foregoing evidence the jury could properly have concluded that the symptomatology disclosed in the army medical reports indicated no more than a transitory and inconsequential indisposition caused by nervousness or anxiety, and that such indisposition was not related to the ailment which caused the death of decedent; that decedent did not attach any significance to these medical reports; and that the insurance company also would not have considered the army records of sufficient importance either to examine or, if examined, to influence its decision as to issuing the policy to decedent.

Failure to disclose data which would not affect the risk or the making of the insurance contract is immaterial. Under comparable circumstances we held in *Ransom* v. *Penn Mut.*

*Life. Ins. Co.* (1954), *supra,* 43 Cal.2d 420, 427, that "The fact that [the insured] erroneously answered 'No' to the question whether an electrocardiogram had ever been made of his heart action is immaterial. An incorrect answer on an insurance application does not give rise to the defense of fraud where the true facts, if known, would not have made the contract less desirable to the insurer." (See also Ins. Code, § 334; *Hawley* v. *Liverpool, London & Globe Ins. Co.* (1894), 102 Cal. 651, 653-654 [36 P. 926]; *Wormington* v. *Associated Indem. Corp.* (1936), 13 Cal.App.2d 321, 324 [56 P.2d 1254]; *Kleiber M. T. Co.* v. *International Indem. Co.* (1930), 106 Cal.App. 709, 723-724 [289 P. 865].) It cannot seriously be gainsaid that the jury could have concluded from the evidence summarized above that the nondisclosures of the decedent would not have affected the risk to or the action by the company at the time of issuance of the policy.

Specifically relating the above mentioned evidence to the questions which decedent allegedly answered fraudulently, the jury legitimately could, and presumptively did, place the following interpretation on the answers of decedent:

"4. (a) When did you last consult or receive treatment for your health from any physician, surgeon or practitioner? *10 Years ago.*" Disregarding the place-of-employment-fellow-employe examination for the temporary and wholly inconsequential abdominal indisposition hereinabove described, the answer was true. As shown above, the decedent did not go to the hospital for, or receive, treatment; he merely had an examination at his place of employment because of a temporary abdominal pain, and "He felt rather silly afterwards."

"4. (d) State name of every other physician, surgeon or practitioner who has attended you or whom you have consulted for any reason or ailment, serious or not serious, within the past 5 years. (Give all dates and details.) *None.*" Disregarding the above mentioned fellow-employe examination for temporary and inconsequential abdominal indisposition, the answer was accurate.

"4. (e) Are you in good health? *Yes.*" There is abundant evidence to the effect that decedent was, and believed he was, in good health.

"5. Have you ever had a health or physical examination? (Give dates, reasons and names and addresses of persons who made examinations.) *U.S. Army Induction 1944.*" Decedent lumped all of the contemporaneous examinations into one,

but the response given adequately answers the questions asked insofar as it was in any way material to defendant.

"6. (c) Have you ever had a special heart study or an electrocardiogram? *No.*" It can be argued that in answering this question the decedent should have known and recalled and related that the *army* had had an electrocardiogram made of his heart. But that is not what the question asked. The question "Have *you* ever had a special heart study or an electrocardiogram" is manifestly different in implication from the making by the army of an electrocardiogram during an examination for active military duty. There is no evidence that decedent felt ill and on that account requested this cardiographic examination or even knew the results of the test, and it appears that neither he nor the army doctors attached much significance to it. Obviously *he* did not have the study, if any, or electrocardiogram, made. Furthermore, from the evidence hereinabove related, it is to be presumed that the jury found (as legitimately they could) that the insurance company would not have changed their decision based on the results of this test.

"6. (d) Have you ever been in a clinic, hospital, sanatorium or asylum for observation, treatment or diagnosis? *No.*" As hereinabove related it is true that while decedent was working in a hospital he had a fellow employe examine him and diagnose an abdominal pain. As also above stated the finding was completely negative and the incident was dismissed as a psychosomatic manifestation. Liberally viewed in support of the jury's verdict (and as against an insurer) his answer was not untrue; he was not in the hospital *"for* observation, treatment or diagnosis"; he was there *for work* and as an incident of his presence for that purpose had the examination.

"8. Has there been any suspicion of, or have you ever had or been treated for any of the following diseases or ailments: . . . (d) Palpitation of heart, shortness of breath, pain in chest, abnormal pulse, any disease of the heart or blood vessels or a high blood pressure? *No.*" The jury rightfully found this answer to be true. Decedent had never been treated for any of these diseases, and had not had them to his knowledge. Even assuming he had full knowledge of the army medical reports, it is reasonable to assume that, in view of the army's policy as to waivers, the decedent did not attach any significance to the results of his physicals and did

not consider that there was even any suspicion of the named diseases.

"11. Have you ever had any illness, disease, operation or injury other than as stated by you above? (If so, give full particulars, date, duration, severity, etc. of each. Use reverse side if necessary.) . . . *Nothing other than usual childhood diseases.*" There is nothing in the record to indicate that this question was not answered truthfully, to the best of decedent's knowledge; certainly the evidence supports the jury's determination to this effect.

Since a reasonable construction of the evidence supports the verdict of the jury, and as no prejudicial error is shown, it is the duty of this court to affirm the judgment. In a case such as this, where the ground urged for reversal is that the evidence is insufficient to sustain the judgment, "the power of the appellate court is limited to the determination of whether there is any evidence, contradicted or uncontradicted, which will support the judgment rendered, and all reasonable inferences must be indulged to uphold it, if possible" (*Memorial Hosp. Assn.* v. *Pacific Grape etc. Co.* (1955), 45 Cal.2d 634, 635 [1] [290 P.2d 481]) and, "When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the [trier of fact]" (*Primm* v. *Primm* (1956), 46 Cal.2d 690, 694 [2] [299 P.2d 231]). (See also *McCarthy* v. *Tally* (1956), 46 Cal.2d 577, 581 [3, 4] [297 P.2d 981]; *People* v. *Baker* (1954), 42 Cal.2d 550, 563 [2] [268 P.2d 705]; *Estate of Bristol* (1943), 23 Cal.2d 221, 223 [2] [143 P.2d 689]; *Webster* v. *Board of Dental Examiners* (1941), 17 Cal.2d 534, 539-540 [2] [110 P.2d 992]; *Crawford* v. *Southern Pac. Co.* (1935), 3 Cal.2d 427, 429 [1] [45 P.2d 183]; 4 Cal.Jur.2d 485, § 606.) If we follow the above quoted law with fidelity to the record which has been epitomized the judgment in this case must be affirmed.

Gibson, C. J., and Carter, J., concurred.

Respondent's petition for a rehearing was denied July 16, 1957. Gibson, C. J., Carter, J., and Schauer, J., were of the opinion that the petition should be granted.